[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 245 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 246 
The defendants not having appealed from any portion of the decree of the supreme court, so much of that decree as declares that Dr. Bullions had been deposed from the ministry, and that the trustees could not rightfully appropriate the funds of the corporation to his support, while he continued so deposed, without the consent of all the members of the corporation, and as prohibits such appropriation for the future, is to be regarded as final and conclusive. This court can only review those parts of the decree from which an appeal is taken. (Kelsey v. Western,
2 Coms. 500.) It is not, however, to be inferred from this portion of the decree, that the supreme court intended to affirm the views of the trust, insisted upon by the complainants; because that part of the decree of the vice chancellor which declares the nature of the trust, was expressly reversed and annulled by the supreme court. The whole case therefore, except so far as it is involved in the simple prohibition in regard to the support of Dr. Bullions, is before this court; and in determining the questions which must necessarily be here decided in respect to the removal of the trustees, and their obligation to account, it becomes indispensable to pass to some extent upon the powers, duties and functions of trustees of religious corporations, the tenure by which they hold the corporate property, and the nature of the trusts committed to their charge. *Page 247 
Two distinct views have been taken of the nature of the corporations formed pursuant to the statute of this state providing for the incorporation of religious societies. According to one of these views the society itself does not become incorporated, but only its trustees. The individuals composing the society, the persons associated for the purpose of religious worship, form no part of the corporation, and are not to be regarded in any sense as corporators, but simply as members as well after as before incorporation, of a voluntary association, without unity, except such as may be produced by the assent of its members to its own self-imposed rules and regulations. The trustees in this aspect, constitute a body corporate entirely separate and distinct from the society, created for the sole purpose of receiving and holding the legal title to the property, and devoting it to the purposes and and objects of the society, which is supposed to retain its distinctive characteristics as a mere voluntary association, in no degree merged in the corporation, even in respect to its temporal and secular concerns. The consequence of this view of the subject would be, that the trustees of a religious corporation are not to be regarded as the managing officers and agents of the society, clothed with the aggregate powers of the corporators, representing their interests and entrusted with a discretionary charge of their temporal affairs, as in other corporations, but their relations to the society are those simply of a trustee to his cestui que trust, as understood in equity. Were this view established, its effect would probably be, to devolve upon the courts of equity the administration of the entire property of religious corporations throughout the state, a jurisdiction bringing with it as its inevitable concomitant, enumerable judicial enquiries into modes of faith, shades of religious opinion, and all those subtleties which attend the diversities of religious belief.
The other view assumes that the society itself is incorporated; that the previous voluntary association is merged in the corporation, so far as its secular affairs merely are concerned; that the trustees are not the body corporate itself, but merely *Page 248 
its officers, to whom is committed the custody of its property, and the management of its concerns; that the members of the association form the constituent body, the legal entity which is represented by the trustees, and that the latter are clothed with the customary discretionary powers which appertain to the managing officers of all civil corporations; modified it is true in some degree, by the mixed nature of the body which they represent, and the peculiar objects of the incorporation.
The argument by which the former of these views is sustained, rests mainly upon that clause in the third section of the act authorizing these incorporations, which, after providing for the election of these trustees, declares, not that the society, but that such trustees and their successors shall by virtue of the act, be a body corporate, by the name or title expressed in the certificate. But while I do not deny the force of this and the other arguments adduced in support of this construction of the act, I nevertheless insist that the arguments against it are too strong to be resisted. In the first place, such a construction is adverse to the universal popular sentiment in respect to the law in question. To prove this I need only refer to the names adopted by the various religious societies upon becoming incorporated. The following list was taken promiscuously from the records of religious corporations in Monroe county, viz: Churchville Presbyterian Society. First Congregational Society of Mumford. Associate Reformed Association of Beulah. Adams' Basin Free Church Society. Baptist Church and Society of Sweden. Society of Christian Brethren in Rochester. St. Peter's Presbyterian Congregation, Rochester. Fifth PresbyterianSociety and Congregation of Rochester.
Of the great number of religious corporations in the county almost all bear names similar in character to these. The trustees are sometimes, though rarely named.
The founders of these corporations must have supposed, that it was the society or congregation that was incorporated. I hazard nothing in saying, that this has been the general under *Page 249 
standing throughout the state, ever since the passage of the acts in question.
But this view of the nature of religious corporations is not only opposed to the general sentiment of the people, but is repugnant also to judicial construction so far as any has ever been given to the acts in question. In the case of The BaptistChurch, c. v. Witherell, (3 Paige, 296,) Chancellor Walworth treats, throughout, the society or congregation as the corporate body, the members of the society as corporators, and the trustees as the mere officers of the corporation. He says: "At the time the deed of Norton and wife was executed conveying the property to this society by their associate name, the statute was in existence, by which the members of the society were authorized to incorporate themselves whenever they thought proper." Again he says: "My opinion therefore upon the facts now before me is, that the corporation organized on the 6th of September, succeeded to the temporal rights of this society; and that the trustees of that incorporation are legally entitled to the possession and control of the meeting house and other temporalities of the congregation." And again, "The fact that the corporators, whom the complainants [the trustees]represent, own two-thirds of the pews, cannot alter the rights of the parties." The same view is taken in the subsequent case ofLawyer v. Cipperly, (7 Paige, 281.) So in the case ofMiller v. Gable, in the late court of errors, (2 Denio,
492,) Gardiner, president of the court, speaks of trustees as "the representatives" of the congregation, and of the members of the latter, as corporators. It is clear therefore that if the popular understanding of the act authorizing religious corporations be an error, it is one in which the most enlightened of our courts and judges have participated.
The view of the act we are combating is contrary to the general scope and language of the act itself. It stands opposed in the first place to its title, which is "An act to provide for the incorporation of religious societies." It is irreconcilable with section nine of the act, which provides "That whenever any religious corporation within this state, other than the chartered *Page 250 
corporations, shall deem it necessary, and for the interest of such religious corporation to reduce their number of trustees, it shall and may be lawful for any such religious corporation, to reduce their number of trustees at any annual meeting." The trustees have no annual meeting; but this section authorizes thecorporation to reduce the number of their trustees, at an annual meeting. This admits of but one construction. Again, this view is directly repugnant to the 14th section of the act which provides "that the corporation of the Methodist Episcopal Church in the city of New-York, shall be and hereby are authorized to continue to elect nine trustees of the said corporation." Here the congregation in whom the right of election rests is styled the corporation in the act itself.
It cannot, I think, be necessary to pursue this subject further, although there are other portions of the statute which equally conflict with the view, that the trustees and not the society constitute the body corporate. I think it clear, therefore, that the views which appear to have been generally entertained by both courts and people upon this subject are correct; that the societies are themselves incorporated; that their members are the corporators, and the trustees the managing officers or the corporation.
What then are the powers, rights and obligations of this class of corporate officers, and to what extent has this court jurisdiction over them? These questions are to be answered in view of the statute authorizing the incorporation of these societies, and the rules which regulate other corporations of the same legal character, and their officers; and not with reference to those peculiar principles which are applied to trusts by courts of equity. These officers are trustees in the same sense with the president and directors of a bank, or of a railroad company. They are the officers of the corporation to whom is delegated the power of managing its concerns for the common benefit of themselves and all other corporators; and over whom the body corporate retains control, through its power to supersede them at every recurring election. *Page 251 
This is the plain inference to be drawn from the statute itself. Section four provides, among other things, not only that the trustees may take into their possession and custody all the property real and personal of the corporation, and may purchase and hold additional property, and demise, lease and improve the same for the use of the society, and repair, alter and erect church edifices, school houses and other buildings; but also that they may "make rules and orders for managing the temporal affairs of such church, congregation or society, and dispose of all moneys belonging thereto, and regulate and order the renting the pews, in their churches and meeting houses, c., and all othermatters relating to the temporal concerns and revenues of such church, congregation or society." These are broad and sweeping powers, and the reason for their amplitude is to be found in the policy of the legislature, which aimed to produce an entire separation between the spiritual and temporal concerns of these associations, and to prevent the latter from being in any manner brought under the control and management of the ecclesiastical judicatories. It was not designed to interfere in the slightest degree with the proper functions of these judicatories, but simply to limit them to their appropriate sphere. The provision giving to every member of the congregation the privilege of voting, and the entire omission of any requirement in respect to the religious views or opinions of the persons to be elected as trustees, afford unmistakeable evidence that no very rigid adherence to any particular creed or doctrine was contemplated, so far as concerned the management of the temporal affairs of the society; but that it was intended to leave all this to be regulated and controlled by the members of the corporation through the exercise of their legitimate corporate powers.
It follows from this view, that the supreme court were entirely right in holding, in this case, that these incorporated societies are not to be regarded as ecclesiastical corporations, in the sense of the English law, which were composed entirely of ecclesiastical persons, and subject to the ecclesiastical judicatories; but as belonging to the class of civil corporations to be controlled *Page 252 
and managed according to the principles of the common law, as administered by the ordinary tribunals of justice.
The question then arises, to what extent had the late court of chancery jurisdiction and control over the officers of civil corporations, in respect to the performance of their official duties? This question was ably discussed by Chancellor Kent, inAttorney General v. Utica Insurance Company, (2 John. Ch. 371.) He there held, that the court of chancery did not possess any general supervisory control over corporations of this character, and inclined to the opinion that the court had no jurisdiction whatever, even in a case of abuse by a corporate trustee, or other officer of his trust, by a perversion or misapplication of the funds of the corporation.
But, if it be admitted that a court of equity has power, by virtue of its general jurisdiction, over every species of trust, to interfere at the instance of a corporator, in cases of gross violation of duty by the managing officers of a civil corporation, which is at least doubtful; the question still remains, how may this jurisdiction be exercised? Does it extend to the removal of the officers of the corporation? It is difficult to conceive from what source, the court, independent of legislative enactment, could derive such a power. This class of officers receive their authority directly from the sovereignty of the state. The statute prescribes their qualifications, the mode of their election, and the tenure of their offices. What power has the court of chancery, or any other court, to set aside the statute; to impose conditions to the holding of the office which the statute does not impose? There is a wide difference between this description of officers and mere private trustees, whose powers rest solely upon individual contract. There, if the conditions of the contract be violated, the office is rightfully forfeited; and the court may enforce this forfeiture at the instance of the party aggrieved. But the powers of corporate officers have a source above that of mere private contract, over which the court of chancery has no paramount authority. No such power was ever asserted or claimed by the English court of chancery. On *Page 253 
the contrary, when the question arose in the case of the Att'yGen. v. The Earl of Clarendon, (17 Vesey, 491,) the power was peremptorily denied. "This court," said the master of the rolls, "I apprehend, has no jurisdiction, with regard either to the election or amotion of corporators of any description." There is a class of English cases, of a different character, which have been sometimes referred to in discussions on this subject, but which afford no support to the doctrine contended for here. They are cases where a corporation is made a trustee, having no beneficial interest in the fund. There, if the corporation grossly abuses the trust, it will be removed by the court of chancery, in the same manner as an individual trustee. Such was the case of Ex parte Greenhouse, (1 Madd. 92.) This is merely the exercise of the ordinary jurisdiction of the court, and is widely different from the removal of corporate officers for a violation of their duty to the corporation.
The power here denied has been admitted by one or two of our judicial officers. (See Lawyer v. Cipperly, 7 Paige, 281;Bowden v. McLeod, 1 Edw. Ch. R. 588;) and was exercised by the assistant vice chancellor of the city of New-York, in the case of Kinskern v. The Lutheran Churches, (1 Sandf. Ch. R. 439.) The vice chancellor went so far in his opinion in that case, as to authorize a decree, not only removing the trustees, but disfranchising a portion of the corporators, and prescribing who should be permitted to vote at the new election, to be held under the supervision of a master of the court; thus entirely superseding the statutory provisions prescribing the qualifications of electors. But the eminent counsel for the complainant, in preparing the decree, seems to have omitted entirely to avail himself of the privilege of disfranchisement thus conceded to him; an omission which is somewhat significant of his own opinion upon the point. This case is, in my judgment, in conflict with principle, and wholly unsustained by authority, in so far, at least, as it asserts the original power of the court of chancery to remove the trustees of a corporation regularly elected, in pursuance of the provisions of the statute, and to *Page 254 
substitute upon a new election qualifications for electors defined by itself, instead of those prescribed by the statute.
But in addition to the absence of all authority in favor of such a power at common law, the express provision of our statute, conferring the power upon the court of chancery in regard to corporations in general, and excepting religious, and one or two other classes of corporations, affords affirmative evidence, that independent of the statute, the power did not exist. (2 R.S. 462, § 33, and 466, § 57.) The supreme court, therefore, were clearly right in denying the existence of this power.
This brings us to the consideration of the alleged trust in the present case. In the view I take of the case, it is unnecessary to inquire as to the effect of the deed of July, 1786, or whether a court of equity would sustain the right of the congregation to an equitable fee under that deed, agreeably to the obvious intent of the parties, or compel a further assurance to effectuate that intent; but I shall consider the case as though all the rights, either legal or equitable, of the congregation or its trustees, derived under the first deed, were fully merged in the second. Under this deed the persons named became seised of an estate in fee, which they held subject to the trust expressed in the deed, until the congregation became incorporated in 1826. What then was the effect of that incorporation upon the title to this property, and upon the trusts under which it was held? We are saved the necessity of inquiring whether the title actually passed to the corporation; because, the counsel on both sides concede that such was the effect of incorporating the congregation.
A question arises as to the construction of the clause in the deed limiting the trust. If by members "in full communion," c., is intended members of the church, or the body of covenanted professors of a certain faith, as distinct from other members of the association, which I suppose to be its true interpretation, then prior to the incorporation the title to the property was held not for the benefit of the congregation at large, but for the exclusive *Page 255 
use and benefit of the members of the church of a particular connection.
What effect then had the transfer of the title to the corporation upon this trust? This involves the inquiry, whether trustees of a religious corporation can take a trust for the exclusive benefit of a portion of the body, whose interests they represent, and whose officers they are. In the case ofWilliams v. Williams, decided by this court in January last, it was held that the trustees of such a corporation might take a bequest in trust for the support of a minister, that being one of the general objects for which the corporation existed. Denio, J., in that case says: "The object of this bequest is, the support of a minister, which is one of the most prominent of the objects for which these corporations are created. It is not essential to the validity of a bequest to a religious corporation, that it should be given generally, for all the purposes for which it may be legally used, or for any to which the trustees may see fit to devote it. This is apparent from the language of the provision as well as from the reason of the case. These corporations are authorized to take property, for the use of the society, `or other pious uses,' which plainly shows that a benefactor may apply his bounty to the whole, or any one or more of the various purposes for which the corporation are authorized to hold property." (MS. Opinion.) The learned judge in this passage nowhere intimates, that the trustees of an entire corporation can take and hold property for the sole benefit of a portion of the members of that corporation, and exclude the other members from all participation in its use. His language, in my view, tends strongly to repel any such conclusion. He says they are authorized to take property for the use of the society: and that they may take it for any of the objects for which thecorporation, that is, of course, the corporation as an entirety, was created. It would be difficult, I think, to maintain, that it would be compatible with the office and duties of trustees of a religious corporation, that they should take and hold and administer the revenues of property, from the benefits of which a portion of the corporators must be excluded. It *Page 256 
would prove an entering wedge of division, the force of which even Christian charity and forbearance would scarcely be able to resist. But the unanswerable objection to such a trust is, that it is not authorized by the statute, and is inconsistent with its general scope and object, as well as with its terms.
It follows from this, that when the title to the property in question passed, as it is conceded it did, to the trustees of the corporation, by the voluntary act of all the parties interested either as trustees or beneficiaries, the trust, if its character was such as we have supposed, was merged; or was at least transmuted into a trust, for the benefit of the entire corporation. No question arises here in regard to the effect of this change, as between the trustees and the original grantor or his heirs. The exclusive trust in favor of members of the church of a particular faith, if such a trust existed, being thus at an end, the title stands as though it had been conveyed to the trustees for the use and benefit of the corporation generally.
But it is said that the nature of the trust may be ascertained, not only from the language of the deeds by which the property is conveyed, but may be inferred from the tenets, faith andpractice of the creators of the fund; and hence that it is those inferred in this case, that a trust was intended in favor of those only who adhered to the principles and practices of the Associate Synod of North America. This doctrine, if it means any thing more than, that where the language of the deed is ambiguous it may be explained by proof of the surrounding circumstances, I deny. It is at variance with well established principles, and rests, as I conceive, upon no sound and reliable common law authority. In the first place, conditions and limitations are not to be raised by inference or argument. (See 4 Kent's Com. 132.) The law favors the free and untrammeled alienation of property, simplicity in its title, and freedom in its use; especially in this country: and every presumption is against the existence of limitations, restrictions or qualifications.
But the English cases upon which this doctrine of implied restriction is supposed to rest, do not support it. The leading *Page 257 
cases, and those usually relied upon to sustain it are, AttorneyGeneral v. Pearson, (3 Meriv. 353,) and those relating to the Lady Hewley charities, viz. Attorney General v. Shaw, (7Sim. 309;) and same case in the house of lords, (9 Clark Fin. 355.) The doctrine of these cases has been so perverted and misapplied that I find it necessary to give to them a somewhat extended examination. They seem to me not to have been fully analyzed when referred to in the cases which have been made to rest upon their authority.
In Attorney General v. Pearson, a meeting house and lot, belonging to a congregation of Protestant dissenters in Wolverhampton, was held by trustees; the trust being expressed in the deed to be "for the worship and service of God." The deed also contained this clause, viz: "That if at any time thereafter meetings for the worship and service of God, should beprohibited by law, and thereby the meeting house should become useless, it should be lawful for the trustees for the time being to sell and dispose of the same," c. The deed bore date in 1701. The contest was between a majority of the trustees who were Unitarians, and a minority of one who was a Trinitarian, for the possession of the trust property and the administration of the trust. The main question involved in the case was, whether the property thus held could be devoted, consistently with the trust, to the support of a Unitarian minister and the worship of a Unitarian congregation. It was alleged in both bill and answer, that the trust was created for the benefit of a congregation ofdissenters; so that no question arose on that subject. The chancellor held, that the trust could only be administered for the benefit of a congregation, and the support of a minister professing Trinitarian doctrines. The reason is important, and the key to the whole case. It was, that worship by Unitarians and the preaching of Unitarian doctrines at the time the trust was created were prohibited by law; were indeed a crime, both by the common law and under the statute of 9 and 10 Will. 3, ch. 32; and it was not to be presumed that any person intended to establish a trust and a worship which was illegal and criminal. *Page 258 
That this was the true reason upon which the decision was based, may be proved beyond doubt or cavil from the case itself. First, from the arguments of counsel, who rested the case almost entirely upon this ground. Sir Samuel Romilly, in arguing for the complainants, said, "In 1701 land was settled and a meeting house built for the service and worship of God, and there can be no question in a court of justice that by that expression is meant the worship and service of God according to the Trinitarian doctrine, because the opposite doctrine with respect to the nature and character of the Supreme Being had at that time no legal existence, being expressly excepted out of the toleration act." The whole argument upon that side was of the same tenor.
Again, this ground for the decision is plainly to be collected from the language of the chancellor himself; especially from that part of his opinion in which he asserts, that if the nature of the trust were to be determined upon the language of the deed alone, independent of the averments and admissions in the bill and answer, it would be the duty of the court to execute it in favor of the established church. After adverting to the allegations in the pleadings as sufficient to show that the trust was created for the benefit of a congregation of dissenters, he proceeds as follows: "I observe upon this, particularly, because I take it that if land or money were given for the purpose of building a church or a house, or otherwise for the maintaining and propagating the worship of God, and if there was nothing more precise in the case, this court would execute such a trust by making it a provision for maintaining and propagating theestablished religion of the country." No doubt the court would do this; and why? Simply because the legal presumption would be that the donor intended a trust and a worship which would be consonant to law. By parity of reasoning, when the trust was admitted to be for the benefit of dissenters, but was otherwise general, the court would limit it to dissenters who were within, in preference to those who were excepted from the toleration act. *Page 259 
Now this is all that is really decided in this noted case. It is true there is a great deal more said about religious and charitable trusts in general; but much of what is so said, and especially that part in relation to determining the nature of the trust, from the tenets and practices of its founders, isobiter; and is not law at this day, even in England, as I shall presently show. Why then should this case be so frequently cited and so much relied upon in this country? That it is so proves, that our courts have not always reflected upon the difference in this respect, between a country where all religions, at least all forms of the Christian religion, are tolerated and placed upon an equal footing, and one where a particular form of worship is established by law. The case under review, considering the nature of the point decided in it, is wholly without weight in this country; because we have no religious system to which it can apply.
We come now to the still more celebrated case of AttorneyGeneral v. Shaw, involving the construction of the Lady Hewley charities. (7 Simons, 290, in note.) Lady Hewley, by deed executed in 1704, had conveyed various estates in Yorkshire to trustees upon certain trusts, which so far as they are required to be noticed here, were as follows, viz: Out of the rents, issues and profits "to pay and dispose of such sums of money, yearly or otherwise, to such and so many poor and godly
preachers for the time being of Christ's holy gospel, and to such poor and godly widows for the time being of poor andgodly preachers of Christ's holy gospel, at such time and times and for so long time and times, and according to such distributions as the said trustees and managers for the time being or any four or more of them shall think fit." In this case as well as in that of Attorney General v. Pearson, a majority of the trustees had become Unitarians, and the bill was filed in behalf of the minority, to have the trusts declared in their favor, and to obtain a removal of the trustees who were Unitarians, and an injunction to restrain them from proceeding to the election of new trustees. It was admitted on both sides in this case, as *Page 260 
it was in that of Attorney General v. Pearson, that the trust was not intended for the benefit of ministers of the established church. The questions therefore, were nearly indentical with those which arose in that case.
The case of Attorney General v. Pearson, however, arose upon a motion for an injunction, founded upon the pleadings alone. All that was there said therefore about a resort to extrinsic parol proof to ascertain the nature of a trust created by deed for religious purposes, was foreign to the case. But the case of Attorney General v. Shaw was heard upon pleadings and proofs. The complainants, adopting the dictum of the chancellor in Attorney General v. Pearson, had introduced a mass of evidence to show the particular religious tenets, faith and belief of Lady Hewley, consisting among other things, of extracts from her will; also from the will of Sir John Hewley, her husband, and from that of Dr. Colton, one of the trustees appointed by her. They also examined witnesses as to the meaning of the terms "godly preachers," "godly persons," "Presbyterians,"c., at the time of the foundation of the charities. All this testimony was read upon the hearing before both the vice chancellor and the chancellor, and as appears from their opinions, was taken into consideration. The vice chancellor put his decree exclusively upon the ground that it was shown that Lady Hewley was a Presbyterian, and that the Presbyterians of her day believed in the divinity of Christ, and in the doctrine of original sin; and hence he held that persons who denied those doctrines could not be entitled to the benefits of the trust. The chancellor, Lord Lyndhurst, however, although he adopted the views of the vice chancellor in this respect, also placed his decision upon the ground that Unitarian doctrines being prohibited by law, it was not to be presumed that Lady Hewley intended to create a trust in violation of law. After stating the statute, the effect of which was to prohibit the preaching of Unitarian doctrines, he says: "I cannot therefore, bring myself to the conclusion that Lady Hewley intended to promote and encourage the preaching of doctrines contrary to *Page 261 
law; that she intended purely to violate the law, it would be contrary to every rule of fair construction and legal presumption to decide." Again he says: "On these two grounds then, each of which appears to me to be conclusive; first of all, that I cannot presume that this pious lady intended that her estates should be employed to encourage and promote the preaching of doctrines directly at variance with what she must have considered as essential to Christianity; and that she could not intend toviolate the law: on those two grounds I feel myself, as a conclusion of fact, compelled to come to this determination; that she did not intend, under the description of godly preachers,
to include those persons who impugned the doctrine of the trinity."
There was an appeal from the chancellor's decree to the house of lords, and my object is to show that in this court, where the whole judicial force of England was assembled, the doctrine of the vice chancellor and the chancellor, that the objects of the trust might be inferred from the tenets, faith and belief of Lady Hewley, was entirely discarded, and that the decree was affirmed solely upon the second ground assumed by the chancellor, viz: That a trust for the benefit of Unitarians would be contrary tolaw, and therefore, was not to be presumed. This may be conclusively shown from the report of the case in 9 Clark andFinnelly, 355. Upon the conclusion of the very elaborate and able argument of the cause in the house of lords, that body submitted to the judges a series of questions, upon which their opinions were required; only two of which it is necessary to notice. The first was as follows: "Whether the extrinsicevidence adduced in this cause, or what part of it is admissible for the purpose of determining who are entitled, under the terms "godly preachers of Christ's holy gospel," "godly persons," and the other descriptions contained in the deeds of 1706 and 1707, to the benefit of Lady Hewley's bounty." The fourth was this: "Whether, upon the true construction of the deed of 1704, ministers or preachers of what is commonly called Unitarian belief and doctrine, and their widows and members of their congregations, and persons of what are commonly called *Page 262 
Unitarian belief and doctrine, are excluded from being objects of the charities of that deed."
Seven of the twelve judges, together with the Chancellor, Lord Cottenham, delivered opinions upon these questions. Of these seven, only two, viz. Justices Coleridge and Williams, were of opinion that the extrinsic evidence was properly admitted. Justices Maule and Erskine were clearly of opinion that no portion of it was admissible. Baron Parke doubted whether any of it was admissible; and Baron Gurney and Chief Justice Tindal, together with Lord Chancellor Cottenham, were of opin ion that none of it was admissible, except such as came within the ordinary rule, that parol evidence may be given of the "surrounding circumstances" under which a deed is executed, when its language is not explicit. The chancellor, after adverting to this as the true rule, says: I have thought it right to make these observations upon this matter of evidence; as otherwise, the affirmance of the decree might seem to sanction the receiving all the evidence received below, which might tend to introduce much doubt and confusion in other cases. The second of the above questions, being the fourth put to the judges, was answered by the judges in the affirmative; all, except two or three, putting their opinions distinctly upon the ground, that a trust for the benefit of Unitarians being contrary to law, the presumption was against an intention to create such a trust.
So far, therefore, as the house of lords in England, with the aid of all the judges of the highest courts, can do it, the doctrine, that the nature of a trust for religious purposes, created by deed, may be inferred from parol evidence as to the religious faith and tenets of the founder, in the broad sense in which it seems to have been generally understood, is overthrown; or, at least, the doctrine finds no support in this case concerning the charities of Lady Hewley.
But, were it otherwise, and were we to infer in this case, either from the evidence on this subject, or from what appears upon the face of the deed, or any other source, that a trust was intended in favor of persons of a particular religious faith; then *Page 263 
I hold it to be clear, that a religious corporation in this state can be the recipient of no such trust, for the reason, that its execution would be entirely inconsistent with the provisions of the act authorizing such incorporations. This can be readily shown. The trustees are authorized by section 4, to purchase and hold real and personal estate, for the use of the church,congregation or society. If they may take a trust limited, as supposed, it may become their duty to administer the trust for the exclusive benefit of a portion only of the congregation or society. This is not authorized by the act. It is repugnant, not to the section to which I have referred alone, but to various other provisions. Section 7 prescribes the qualifications of electors, and it is not in the power of the congregation, nor of any portion of the society, or even of the courts, to change these qualifications, or prescribe any other. The majority of the congregation may be composed of persons of any religious faith, or of no particular faith, and still, their right to vote, and to control the election, is not affected. This is inconsistent with the idea, that the trustees can be expected to execute any trust, except such as is acceptable to the majority of the congregation.
But such a trust would be still more repugnant to the provisions of section 8. By that section the salary of the minister is put absolutely, and at all times, under the control of a majority of the congregation. The trustees have no control over the subject, but are imperatively required to ratify and pay the salary fixed by the majority. Whatever may be thought of the other provisions of the act, this section must forever give to the majority of the congregation the control over the employment of the minister. It would be in vain for any donor of property or funds to the congregation, to prescribe the religious faith of the minister to whose support the avails should be devoted; for, until the salary should be fixed by a majority of the congregation, not one dollar of the revenues of the society could be appropriated by the trustees to its payment.
The whole act shows, that it was the intention of the legislature to place the control of the temporal affairs of these societies *Page 264 
in the hands of the majority of the corporators, independent of priest or bishop, presbytery, synod, or other ecclesiastical judicatory. This is the inevitable effect of the provision giving to the majority, without regard to their religious sentiments, the right to elect trustees, and to fix the salary of the minister. The courts clearly cannot disfranchise any corporator who possesses the qualifications prescribed by the statute.
Suppose then, the majority in a particular congregation choose to change entirely their form of worship; how are they to be controlled? Should the court assume in the exercise of its jurisdiction over trusts to direct the trustees to employ a minister of a particular faith, the whole object of the direction might be defeated, by the employment of a minister wholly unacceptable to those who procured the interference of the court; and even if the court went so far as to direct whom they should employ, still the majority would have the right to fix the salary, and the court would clearly have no power to control such majority in the exercise of this discretion, which the statute confides wholly to them. The act has in truth accomplished what the public sentiment in this country would seem to demand, that is, the entire separation of the functions of the ecclesiastical and temporal judicatories, and has limited the former to their proper sphere of control over the spiritual concerns of the people. If this statute is properly construed, we shall have fewer examples of temporal courts engaged in the inappropriate duty of deciding upon confessions of faith, and shades of religious belief and points of doctrine too subtle for any but ecclesiastical comprehension.
The courts have not hitherto fully considered the broad distinction that exists between a voluntary association which may adopt such rules and regulations and such mutual obligations not inconsistent with law, as it may see fit, and a corporation whose powers and functions are prescribed by statute. If a society wishes to devote its property to an unchangeable form of worship and to tie down its members to a Procrustean bed of creeds and confessions of faith, it must remain a voluntary association, *Page 265 
and not commit the management of its affairs to a corporation.
I by no means deny that a grantor of property to the trustees of a religious corporation may annex such conditions to the grant as he may choose, not inconsistent with law; and that the trustees may take the property subject to the conditions. For instance, property may be conveyed to them to be held so long
as the society continues in a certain ecclesiastical connection; or so long as it supports a minister of a certain faith: and this condition if explicit and clear and free from all doubt or obscurity would be good. An uncertain condition would be void.
The title of the trustees under such a deed would be good so long as a majority of the corporators chose to abide by the condition; and when that was departed from, their title would be forfeited. This is widely different from a trust, which is to be enforced in opposition to the will of the majority.
It follows from these principles, that neither presbytery or synod had any control over the Associate Congregation of Cambridge in respect to the minister whom they should employ. That depended upon the trustees and a majority of the congregation. His deposition or excommunication had nothing whatever to do with the right of the congregation to employ him, so far as the administration of its temporalities was concerned; although it might subject them or some portion of them to spiritual censure or ecclesiastical penalties.
While, therefore, it is settled so far as these parties are concerned, by the acquiescence of the defendants in the decree of the supreme court, that the trustees had and still have no right to employ Dr. Bullions, there is no reason for following up that error by requiring them to account.
It may be well briefly to recapitulate here the principal points which I have attempted to maintain. They are —
1. That this court cannot review those portions of the decree of the supreme court not appealed from. 2. That a religious corporation under our statute, consists not of the trustees alone, but of the members of the society. That the society itself is *Page 266 
incorporated, and not merely the trustees, and its members are the corporators. 3. That the relation of the trustees to the society is not that of a private trustee to the cestui quetrust; but they are the managing officers of the corporation, and trustees in the same sense in which the president and directors of a bank or of a railroad company are trustees, and are invested in regard to the temporal affairs of the society, with the powers specifically conferred by the statute, and with the ordinary discretionary powers of similar corporate officers. 4. That an incorporated religious society, under our law, does not belong to the class of ecclesiastical corporations in the sense of the English law; which were composed entirely of ecclesiastical persons, and subject to the ecclesiastical judicatories; but are to be regarded as civil corporations, governed by the ordinary rules of the common law. 5. That if it be granted that courts of equity, by virtue of their general jurisdiction over trusts, may exercise some degree of control over the trustees of a religious corporation in cases of gross abuse of their trust; yet, they have no power to remove those officers, who derive their offices directly from the enactments of the legislature; nor have they power to prescribe qualifications for electors of such trustees, other than those prescribed by the statute. 6. That the trustees of a religious corporation under our statute, cannot take a trust for the sole benefit of members of the church as distinguished from other members of the congregation, nor for the benefit of any portion of the corporators to the exclusion of others, no trust being authorized by the statute except for the use and benefit of the whole society. 7. That where in a deed executed to trustees for religious purposes, the use is expressed in general and not in specific terms, it cannot be inferred from the religious tenets and faith of the grantor, that it was intended to limit the use to the support of the particular doctrines which he professed or the religious class to which he belonged: although if the language creating the trust be ambiguous, evidence of the surrounding circumstances, and among them perhaps of the faith of the donor, may be received, as in other *Page 267 
cases, to aid in its construction. 8. That the trustees of a religious corporation in this state cannot receive a trust limited to the support of a particular faith, or a particular class of doctrines, for the reason that it is inconsistent with those provisions of the statute which give to the majority of the corporators, without regard to their religious tenets, the entire control over the revenues of the corporation.
The decree of the supreme court should be affirmed.