# CASES DETERMINED

AT THE

## *January Term, 1889.*

---

FADNESS and others, Respondents, vs. BRAUNBORG and others, Appellants.

*December 7, 1888 — January 8, 1889.*

*Religious societies: Trusts and trustees: Deeds: Perpetuities: Corporations: Officers: Ouster: Equity: Perversion of trust: Dismissal of minister: Withdrawal from synod: Change of faith.*

1. The fact that a religious society, to whose trustees land was conveyed in trust for the erection thereon of a church, had not been incorporated when the deed was delivered, did not invalidate the trust.

2. The deed in such case vested the legal title in the trustees, and upon the subsequent incorporation of the society such legal title became vested in the corporation, subject to the trust.

3. The designation of the beneficiaries of a trust as the *members* of a certain church is sufficiently definite and certain, under subd. 5, sec. 11, ch. 57, R. S. 1849 (subd. 5, sec. 2081, R. S.).

4. Although sec. 1, ch. 57, R. S. 1849 (sec. 2071, R. S.), declares that trusts, except as authorized and modified in that chapter, are abolished, this was not intended to prohibit the trusts expressly authorized by ch. 47, R. S. 1849 (sec. 2000, R. S.), relating to religious societies.

5. A conveyance of land to the trustees of a religious society and their successors in office forever, in trust for the erection thereon of a church building for the use of the members of the society, did not suspend the power of alienation, within the meaning of secs. 14, 15, ch. 56, R. S. 1849 (secs. 2038, 2039, R. S.), such trustees being "persons in being by whom an absolute fee in possession could be conveyed" in the manner prescribed by law.

6. A religious society incorporated under the laws of this state is a civil corporation, governed by the statutes and such rules of the common law as may be applicable. The trustees are *officers* of the corporation, and before an equitable action can be maintained by members of the society, some of whom claim to be the rightful trustees, to recover possession and control of the property by ousting those who have been in the continuous possession and control thereof claiming to be such trustees, and by enjoining them from acting as such, the plaintiffs who claim to be the trustees must have been peaceably admitted to such offices or have established their title thereto by some direct action or proceeding, as by *quo warranto.*

7. The dismissal of one minister and the employment of another is a matter pertaining to the temporalities of a church, and does not necessarily operate as a change of faith or doctrine. When done by the majority of a religious society in accordance with the statute and the constitution and by-laws of the society, it does not operate as a wrongful exclusion of the minority who adhere to the former minister.

8. Land was conveyed in trust for the erection thereon of a church building for the use of the members of a certain church " according to the rules of said church, and according to the rules of said church " which might thereafter " be adopted from time to time by their authorized synods." The synod to which the church was attached was a mere confederation of local self-governing churches, acting, so far as the local organization was concerned, merely as an advisory body. *Held,* that the mere withdrawal of the church from such synod was not a violation or perversion of the trust.

9. Land was conveyed to trustees in trust for the erection thereon of a church building "for the use of the members of the Norwegian Evangelical Church of St. Paul's on Liberty Prairie, according to the rules of said church," etc. The grant was, presumably, made with reference to the articles of faith previously adopted by said church. The church was subsequently incorporated. the certificate of incorporation simply giving the name of the church. *Held,* that the trustees and officers of the corporation could not lawfully devote the church building to purposes other than those specified in the grant.

10. It is not the province of courts of equity to determine mere questions of faith, doctrine, or schism, not necessarily involved in the enforcement of an ascertained trust. To call for equitable interference there must be such a real and substantial departure from the designated faith or doctrine as will be in contravention of such trust.

11. Where the adoption of certain articles of faith by the majority of a religious society is claimed by the minority to be such a departure from the faith referred to in a trust deed as to result in a perversion of the use of the property granted, the fact that such minority remained united with the majority for more than two years after the adoption of such articles, constitutes an additional reason why, in the absence of a clearly established violation of the trust, a court of equity should not interfere. And the fact that before suit was brought the majority repealed such articles and substantially reaffirmed those previously adopted, is still another reason why the action should not be maintained.

APPEAL from the Circuit Court for *Dane* County.

The following statement of the case was prepared by Mr. Justice CASSODAY:

It appears from the undisputed evidence or the findings of the court, in effect, that prior to May 20, 1852, there was an organized society or congregation known as the Norwegian Evangelical Lutheran Church on Koshkonong Prairie, of which Rev. A. C. Preus, a regularly ordained minister, was the regularly called pastor. That prior to that date a meeting of the representatives of the Norwegian Evangelical Lutherans of southern Wisconsin and northern Illinois was held at Luther Valley, in Rock county, at which said Koshkonong congregation was represented. That at said meeting a "Constitution of the Norwegian Evangelical Lutheran *Church* of America" was adopted, in January, 1851, containing, among other things, the following provisions:

"Section 1. The name of the church shall be 'The Norwegian Evangelical Lutheran *Church* of America.' Sec. 2. The doctrine of the church is the one revealed in the Holy Word of God, in the baptismal covenant, and in the canonical writings of the Old and New Testaments, interpreted in accordance with the symbolical books and confessional writings of the Church of Norway, which are: (1) The Apostolic creed; (2) the Nicene creed; (3) the Athanasian creed; (4) the unaltered articles of the Augsburg Confes-

sion, as delivered to Emperor Charles the Fifth at Augsburg, 1530; (5) the Smaller Catechism of Luther. Sec. 3. *This church* will not acknowledge or recognize any one as minister of the gospel unless he is duly examined, rightfully called, and according to the rules of the church ordained to the clerical office. Sec. 4. The ceremonies of the church, or the divine services, shall be conducted in conformity with the rituals of the Church of Norway and Denmark in 1685, together with the altar book in use in those kingdoms, but modified as the supreme goverment of the church shall from time to time more precisely determine. Sec. 5. The government of the church shall until further [ordered] be a synodical presbyterial, so that every year a synod is held, or a meeting of the church, which is the highest authority of the church. Sec. 6. The synod shall consist of the clergy of the church; that is, the superintendent and ministers who are united with the synod, and who preside over congregations whose doctrines and specific church rules are in harmony with those of the church, and representatives elected from every congregation united with the synod. [Note added to section 6.] *Congregations not connected with the synod*, but whose doctrine and church rules are in conformity with those of the church, *may send delegates*, with right to introduce resolutions directly, and upon submission to state reasons of the same. The synod may thereafter, in its own discretion, allow these delegates the privilege of participating in the discussion upon such resolutions. Sec. 7. The congregations connected with the synod shall send representatives upon the following basis: Every principal congregation shall send three representatives; every annexed congregation which has two hundred members, send two; and every annexed congregation which contains less than two hundred members, one representative. The representatives must be members of the congregations and have credentials from those congregations which they rep-

resent. Sec. 8. The synod shall have power (1) to make general and special rules and resolutions in all religious and ecclesiastical matters; (2) to decide, without further appeal, upon all matters of the church; (3) to select a superintendent from among the clergy connected with the church; (4) to select from its members a church council, to consist of not less than two clerical and four lay members, which shall be proportionately the same if the number be increased." "Sec. 11. When a congregation *wishes to unite* with the church, such congregation shall send its petition to the superintendent, which petition shall be subscribed by the minister, if it has a minister, and the directors. In this petition it must expressly allege *that the congregation submit* to the constitution in force for the Norwegian Evangelical Lutheran Church of America, as well as its other rules and resolutions, *but to every individual congregation is reserved the right to have its own laws for its home management*, only that these be not in conflict with the constitution and resolutions of the church. Sec. 12. With exception of sections 2 and 3, which always shall continue unchanged and irrevocable, this constitution, or any part thereof whatever, can be changed."

That meeting and constitution were preliminary to the organization and establishment of a synod, as such constitution had first to be submitted to the several congregations, and their several actions thereon to be reported back to such general meeting, and then finally acted upon, which was not done until 1853, when such synod was organized and established. No other synod or conference of Lutherans bearing that name has ever been organized in the United States.

Prior to May 20, 1852, the members of said Koshkonong congregation living on Liberty Prairie in Dane county voluntarily separated from said Koshkonong congregation and organized themselves into the "Norwegian Evan-

gelical Lutheran Church of St. Paul's on Liberty Prairie,"
and the said Rev. A. C. Preus continued to serve the said
Koshkonong congregation and the said Liberty Prairie con-
gregation, which were some five or six miles apart, until
1860.

May 20, 1852, Niels Severson and Regnal, his wife, being
such members of said Liberty Prairie congregation, in con-
sideration of five cents to them in hand paid, did give,
grant, bargain, and sell, release, confirm, and convey unto
" Casper Krough, Lars Torgerson, Lars Davidson, Anfind
Asmundson, and Sjure Starkson, trustees in trust for the
uses and purposes " therein mentioned, " all the estate,
right, title, interest, property, claim, and demand whatso-
ever, either in law or in equity, which" the said grantors
had in and to the two and a half acres of land therein de-
scribed, to have and to hold unto them, the said trustees,
" and their successors in office forever, *in trust* that they shall
erect and build thereon a house of worship for the use of the
members of the Norwegian Evangelical Church of St. Paul's
on Liberty Prairie, *according to the rules of said church*,
and according to the rules of said church which may be
adopted from *time to time* by their *authorized* synods or
conferences; and in further trust and confidence that, *as
often* as one or more of the trustees hereinbefore mentioned
*shall die or cease* to be a trustee according to the rules of
said church, *then* and in such case it shall be the duty of
the minister or preacher having charge of said church, or,
in case there is none, then one of the elders or deacons or
other church officers whatsoever *to call a meeting of the
voters* of said church as soon as conveniently may be *and
according to the statute* in such case made and provided, *and
the voters* at the meeting so called shall proceed to nomi-
nate or appoint one or more persons *to fill the place or
places* of him or them whose office or offices have been
*vacated* as aforesaid; provided, that the person or persons so

nominated or appointed shall be twenty-one years old; and in order to keep up the number of five trustees forever." The said trustees, as well as said grantors, had, prior to the organization of said Liberty Prairie congregation, been members of said Koshkonong congregation. Upon the execution and delivery of said deed, the said trustees accepted said trust, and went into possession of said lot, and built thereon, during the years 1852, 1853, and 1854, a meeting-house or church edifice, which is still standing thereon, and for the possession of which this action is brought.

Upon the organization and establishment of said synod in 1853, the said Liberty Prairie congregation, in February, 1853, sent delegates thereto, and became a member thereof. There were from time to time joint meetings of said Koshkonong and Liberty Prairie congregations and trustees from 1853 to 1860 inclusive. At such joint trustees' meeting, December 28, 1854, it was determined that, " should at any time one of these congregations prefer to form an independent parish [*sognekald*], and to call to themselves a separate minister, then shall whichever of the congregations which withdraws from the present union be entitled, after the parsonage has been assessed, to receive its share of the value of the parsonage in proportion to the number of families of the congregation."

February 22, 1858, the legislature of this state, by " An act to incorporate the Norwegian Evangelical Lutheran Synod of the State of Wisconsin," among other things, enacted that: " Sec. 2. The said synod shall have full power and authority to make a constitution for the government of its members, and also to make and provide such by-laws, rules, ordinances, and regulations as may seem best adapted to carry out the objects of the members thereof, and to alter, amend, or repeal the same at such times and in such manner as may be deemed proper and necessary in order to promote the interests, proceedings, and affairs of

said synod, and also to determine the number of officers that are to represent said synod as trustees thereof: provided, that such by-laws, rules, ordinances, and regulations shall not be in violation of the constitution and laws of this state or of the United States." Ch. 28, P. & L. Laws of 1858. By ch. 274, Laws of 1878, the name of said last-named synod was changed to " The Synod for the Norwegian Evangelical Lutheran Church of America." The title to said last-mentioned act was changed to " The Synod for the Norwegian Evangelical Lutheran Church of America " by ch. 89, Laws of 1885.

Rev. A. C. Preus having determined soon to enter upon another field of ministry, the said Koshkonong and Liberty Prairie congregations respectively joined in a written " public and voluntary call," made September 15, 1858, to Rev. J. A. Otteson, " to occupy the field of labor made vacant by the resignation of Rev. Preus," which, among others, contained the conditions: "(1) That you shall proclaim unto us the Word of God in its purity, in accordance with the confession of the Lutheran Church. (2) That you shall, in every respect, carry out our church polity, not only as to doctrine, but also as to discipline and ritual. (3) . . . The congregation, on their part, bind themselves to receive the truth, howsoever it may be proclaimed, and to submit themselves to their pastor in all things that in accordance with God's Word and true church polity he may demand. . . . The use and benefit of the parsonage of ninety acres, the buildings and fences of which to be kept in repair by the pastor. . . . Should you, reverend pastor, or the church, at any time desire to rescind this call, then you, as well as the church, ought to be notified betimes, which is held to be one year in advance." " P. S. At a subsequent meeting of the church-wardens it was, at the request of Rev. Otteson, determined that the last section of the written call, to wit, 'Should you, reverend pastor,' etc., be ex-

punged." Rev. Otteson accepted said call in 1860, and continued to serve said Liberty Prairie congregation, as well as the Koshkonong congregation, until terminated as hereinafter mentioned.

The court found "that by the discipline and rules of the Norwegian Evangelical Lutheran church the call of the minister is one for life, unless he be regularly deposed for false doctrine, immoral life, or neglect of duties, and cannot be terminated by the action of the congregation without the consent of the pastor." In 1861 the said synod declared that, " in regard to the internal arrangement and government of the individual congregations, the synod is only an advisory body. No resolution by the synod in such matters can therefore have binding force on the individual congregation unless it voluntarily accepts it, and if a congregation finds that it is in conflict with the Word of God, or that it is not beneficial to it under its peculiar circumstances, then it has the right not to follow the resolution. This should be announced to the church council, accompanied with the reasons therefor. If such announcement is not sent in within six months after the meeting of the synod, the resolution is regarded as accepted by the congregation." The court found, in effect, that September 8, 1862, the said society or congregation of Liberty Prairie was duly organized under the statutes providing for the organization of religious societies, and a certificate of such organization was duly recorded; and ever since that time, up to May 17, 1885, the said society consisting of both parties here represented and their respective associates, acted as one religious corporation. At a meeting of said synod, in 1865, it was declared that "now it is certainly so, that the congregation, if they desire, can give this right to the synod, and authorize it on its behalf to establish ceremonies. But the question is here, if it is beneficial that the congregation surrender their right and give to the synod a legislative

power in such respects. All were agreed that the synod ought not to have any kind of *legislative authority*, but that it should only be an advisory body. This authority to determine the ceremonies, which, according to the old constitution, was placed in the hands of the synod, it had never made use of. This has already been acknowledged for a long time, that the constitution of the synod was antiquated, and that already, six years ago in a meeting of the synod on Coon Prairie, it was declared that the synod should not be a legislative one, but only an advisory body." At a meeting of said synod in 1867 it was declared that "if the grace of God is not in the means of grace, we must obtain it somewhere else by means of our own labor, and it is impossible in that way to obtain any firm assurance and divine certainty. We must form the same opinion as regards the reform doctrine concerning election, according to which God has from eternity, without regard to the faith or the want of faith in men, predestinated some unto eternal life and others unto eternal death,— a doctrine which is well calculated to lead men either into security or into despair."

In 1876 the said synod adopted a new constitution, of which the following extracts may have some bearing upon the questions considered:

"Chapter 1. *Name, Confession, and Liturgy.* Sec. 1. The ecclesiastical organization heretofore called the 'Norwegian Evangelical Lutheran Church of America' hereby adopts the name and title of the 'Synod of the Norwegian Evangelical Lutheran Church of America.' Sec. 2. The only source and rule of the faith and teaching of the synod is God's Holy Word, revealed in the canonical books of the Old and New Testaments. Sec. 3. The synod adopts as its confession of faith the symbolical books or confessional writings of the Norwegian Lutheran Church, for the reason that these writings give a pure and unadulterated exposi-

tion of the doctrine contained of the Word of God.    These
confessional writings are the following: The three ancient
creeds, to wit, the Apostolic, the Nicene, and the Athana-
sian creeds; the unadulterated Augsburg Confession; Lu-
ther's Smaller Catechism.    NOTE.— The only reason that the
remaining symbols of the Lutheran Church are not enumer-
ated among the symbolical books of our synod is, that
hitherto they are not generally known in our congregations.
Sec. 4. In order that uniformity of liturgical rights may be
preserved, the synod advises the congregations to retain
the Norwegian ritual of the year 1685, and the altar book
of the year 1688.

" Chapter 2.    *Composition and Subdivisions of the Synod,
and Admission to its Membership.*   Sec. 1. The synod is
composed of the congregations that have united by adopt-
ing this constitution.   Sec. 2. Standing members of the
synod, who, as to their official position, are always under
the supervision of the synod, are (*a*) pastors who serve con-
gregations connected with the synod, and who are them-
selves members of the synod; (*b*) members of the church
council.   Sec. 3. As standing members of the synod may
further be admitted (*a*) teachers of the educational insti-
tutions of the synod; (*b*) ministers of the Lutheran con-
gregations which are not connected with the synod; (*c*)
permanently located teachers of parochial schools of Lu-
theran congregations connected with the synod or otherwise.
.   .   .   Sec. 5. When a congregation desires admission into
the synod, such congregation shall send an application for
admission to the president of the district to which, by reason
of its location, it should naturally belong.   Together with
such application shall be submitted a copy of the constitu-
tion and by-laws of such congregation, as evidence that
the faith, confession, and polity of the congregation are
truly Evangelical Lutheran; also a duly attested declara-
tion that the constitution of the synod has been adopted

at a public meeting of the congregation. These documents shall be laid before the district synod, which then acts upon the application. Sec. 6. Any person desiring admission as a standing member of the synod shall send an application for admission to the president of the district in which he resides, together with a declaration that he gives his unqualified assent to the doctrine and confession of the synod, and accepts the constitution. If the applicant be a minister, he shall, before admission, also prove that he has been properly examined and regularly called and ordained a minister of the gospel. Such application, and the documents thereto pertaining, shall be laid before the district synod, which then acts upon the application."

" Chapter 4. *The Object and General Interest of the Synod.* The synod shall watch over the unity and purity of doctrine and promotion of godliness, and hence (*a*) at synod meetings, as well as at district meetings, take up for consideration chiefly such doctrinal questions the discussion of which shall be especially needful; take cognizance of and warn against sects, errors, and sins, as also anti-Christian tendencies of the times; (*b*) watch over the official conduct of standing members, and also the religious condition of the congregations; (*c*) seek to settle religious controversies, and to give advice and opinions on church questions; (*d*) establish and control educational institutions for the training of pastors and teachers, and promote home and foreign missions; (*e*) further the use and spreading of the Holy Scriptures, of other orthodox school-books, hymn-books, and devotional literature; (*f*) collect and manage funds for the support of the educational institutions of the synod, and for the defrayment of the current expenses of the synod.

" Chapter 5. *Business Sphere of the Different Meetings.* Sec. 1. The district synods shall labor for the attainment of the common objects, and shall . . . (*b*) admit into the synod congregations and standing members within the bounds of

the district; (c) when circumstances require it, temporarily supend a congregation or a standing member from their privileges in the synod, and if, despite repeated warning, they wilfully persist in false doctrine or ungodly life, finally sever their connection with the synod, provided the case be not appealed to the synod meeting. . , . Sec. 4. Doctrinal questions and matters of conscience cannot be decided by majorities of votes, but only by the Word of God and the symbolical books of our church. Sec. 5. If not otherwise provided in this constitution, and if not otherwise determined in particular cases by the meeting concerned, all other matters are decided in the above-mentioned meetings by a plurality of votes, and in case the votes are equally divided the vote of the chairman decides the matter. Sec. 6. In respect to the *individual congregations* the above-named meetings *are merely advisory bodies.* Hence, if a congregation be of the opinion that a resolution conflicts with the Word of God, or finds that it is not conducive to the good of the congregation under its particular circumstances, the congregation should report the fact to the president of the meeting concerned, stating the reasons therefor. If no such report is sent in within six months after the publication of such resolution, the resolution shall be considered adopted by the congregation."

"Chapter 9. *Amendments of the Constitution.* With the exception of chapter 1, sections 2 and 3, and chapter 2, section 6, the contents of which shall not be altered, this constitution may be amended," etc.

In 1882 and 1883 a schism arose in the Liberty Prairie congregation respecting the doctrine of election. After a considerable controversy, Rev. Otteson, as pastor, February 10, 1883, and at the request of fifty-one members of the congregation, gave notice of a meeting to be held in Februrary, 1883, "for the consideration of the doctrine of the election of grace, or so much as the meeting may determine,

and to see if we then, by the grace of God, can agree to retain the doctrines taught us in childhood, and as explained to us by our old fathers." At the meeting of the Liberty Prairie congregation, so called, the said church, on or about February 26, 1883, by a large majority of those present, adopted, as its "Articles of Faith," the following, to wit: "(1) The revealed gospel teaches us that God will not surely promise nor give to any sinner eternal life unless he participates in the merits and righteousness of Jesus Christ through faith in him. (2) The election to eternal life is that decree of God in his eternal plan of salvation by which he has determined what sinners alone he would glorify and save, and thus separated these elect from the others, who remain in perdition. (3) In this, his fixed election of certain sinners, in preference to others, to eternal glory and bliss, has God been governed by his purpose of grace,— whosoever believes shall be saved; that is, God elected and destined certain sinners, in preference to others, to eternal glory and salvation, according as he foresaw what sinners, in time, would accept of the proffered grace, believe in Christ, and persevere to the end in such belief. (See Pon- toppidan, Sand. til. Gudf., Quest. 548.) The congregation rejects as false doctrine, when there is taught (1) that participation in the merits of Christ through faith in him is not determining for the will of God concerning the sure salvation of certain sinners in preference to others, but that this participation in the benefits of Christ shall belong only to the way, manner, order, and means by which God in time will execute his eternal decree to save those sinners whom he unconditionally elected to glory; (2) that the election to eternal glory and salvation in heaven shall not be dependent on nor conditioned by any means of the foreknowledge of God about what, in time, sinners should believe in Christ and by such belief partake of his merit; (3) that the election to eternal life has been made with regard

to certain individual sinners, considered only as they, with the rest of the children of Adam, are still in the general corruption and perdition, and that God, in regard to these individual sinners, in preference to all others, shall have made this decree: Such and such shall and must be saved, I will myself provide for; that this, my decree, shall not be annihilated; (4) that God, in the election, shall have predestined certain individual sinners out of the whole and alike damned multitude, both to the end (the glory) and to the way (all the necessary means and blessings necessary to salvation), without the foreseen faith, casting the balance in this election to glory."

April 29, 1884, a resolution was unanimously adopted by the Liberty Prairie congregation to the effect that a call should be extended to Rev. O. M. Saevig, and that Rev. Otteson continue to serve the congregation for another year, and then voluntarily resign. Said resolution was acceded to by said Rev. Otteson at the time. The court found that such adoption of that resolution was "not intended as final, but as steps in the direction of harmonizing differences, which failed." At a regularly called meeting of the Liberty Prairie congregation, December 15, 1884, 143 voters were present, of whom 66 voted for the candidate of the plaintiffs' party, and 77 for the candidate of the defendants' party, but, as no one received a majority of two thirds, it was not regarded as a determination of the question.

It also appears that at a regularly called meeting of the Liberty Prairie congregation, March 4, 1885, two of the defendants, *Braunborg* and *Hendrickson*, were elected trustees without opposition. Up to that time there had always been five trustees of said Liberty Prairie congregation, and there continued to be five thereafter, including the two thus elected. At said meeting the Rev. Otteson, having refused to sign the articles of faith so adopted by

the congregation as aforesaid, and having expressed an unwillingness to resign at the end of the year, a vote was taken as to whether he should be retained by the congregation or discharged, and the result was that 56 voted to have him remain and 87 voted for his discharge. Thereupon it was moved and carried that said Rev. Otteson be declared discharged as such pastor, and also that nobody should officiate as pastor without the permission of the board of trustees, to which the minority protested to the effect that the promise of Rev. Otteson to resign had been upon conditions of compromise not fulfilled, and that they would hold to their old minister and seek to maintain the congregation in its usual form. March 19, 1885, it was unanimously resolved by said defendant trustees "that we permit our late pastor, Otteson, to use the church until the 29th of April, 1885," and that a meeting of the congregation be called for May 1, 1885. The church officers notified Rev. Otteson that he could have the loan of the church for confirmation, May 17, 1885, and for communion, May 20, 1885, but the said trustees refused to allow said Rev. Otteson to preach in or act as the pastor of said congregation after May 17, 1885, but thereafter called and employed Rev. G. G. Krostue as such minister and pastor. Said Krostue was a regularly ordained minister of the Norwegian Lutheran Church. The defendants, *Henry Braunborg, Christian Hendrickson, Torge G. Thompson, Elling Johnson,* and *Ole H. Fimrite* were severally elected trustees by a majority of said congregation at the regular times and place for electing the trustees thereof, and claim to be the regular successors of the trustees named in said deed, and that the defendant *Charles Schoyen* is the acting churchwarden, and that said defendants — trustees, and warden — have had the exclusive control and management of said church edifice ever since May 17, 1885, as in effect found by the court. Since that time the said majority have contin-

ued to occupy said church edifice as a place of worship, with said Rev. Krostue as their minister.

After May 17, 1885, a portion of said minority of said congregation who so favored the retention of said Rev. Otteson separated from said congregation, and worshiped in private houses, halls, and school-houses, with said Rev. Otteson as their pastor. At the time of the annual meeting of said congregation, to wit, March 3, 1886, and in pursuance of notice, such portion of said minority met, and unanimously resolved to recognize said majority which so continued to occupy said church edifice as having withdrawn from the rightful Liberty Prairie congregation, who were therefore declared suspended. Thereupon, and on the same day, the said portion of said minority resolved to proceed to elect five trustees, and thereupon voted for the same, each receiving twenty-seven votes, and that among the persons so elected such trustees were four of the above plaintiffs, to wit, *Fadness*, *Smithback*, *Brichtson*, and *Jargo*, and the plaintiff *Birge* was at the same time elected as churchwarden by said portion of said minority. Said portion of said minority then directed such trustees to ask for the books of the congregation, and, if denied, to take copies. The other trustee so elected was Lars Huseboe. March 2, 1887, the said *Jargo* and Huseboe were re-elected such trustees for the term of three years.

Said majority of said congregation at their annual meeting, March 2, 1887, elected the defendants *Johnson* and *Fimrite* in place of Roe and Carstad, and re-elected *Schoyen* church-warden. At the same meeting said majority adopted the following constitution:

"*Constitution adopted March 2, 1887*. This congregation acknowledges the sacred Word of God, revealed in the canonical books of the Old and New Testament, as the only source and precept of faith, doctrine, and conduct. Sec. 3. The congregation confesses belief in the symbolical

books or the confessional writings of the Norwegian Lutheran Church, because they give a pure and unadulterated exposition of the doctrine contained in the Word of God. These confessional writings are: (1) The Apostles' creed; (2) the Nicene creed; (3) the Athanasian creed; (4) Luther's Smaller Catechism; (5) the Unadulterated Confession of Augsburg, or that confession or creed which was delivered to Charles V. at the diet of Augsburg in the year 1530. The divine services in the congregation shall be performed in conformity with the Norwegian Church ritual of 1685 and the ritual of 1688; these, however, so modified as the corporation may find that the circumstances require. All former precepts or regulations, of what name whatsoever, adopted by this corporation, and which conflict with this constitution, are hereby repealed."

This constitution had been in force since the day and year last aforesaid. At the time of adopting said last-named constitution the said majority also unanimously adopted the following declaration: "As grounds for withdrawal, the congregation adduce in particular the unjust treatment allotted to it during the last synodical meeting of the eastern district, when the synodical meeting refused to admit the legally elected representative of the congregation, which refusal the congregation must consider as a real, if not formal, expulsion. Unanimously adopted."

June 4, 1887, the "Eastern District Synod," in session at Stoughton, passed a resolution to the effect that the synod recognizes the West Koshkonong and Liberty congregations that were being served by Rev. Otteson as being the rightful congregations in connection with the synod.

March 12, 1887, this action was commenced by said trustees and officers so elected by said portion of said minority of the congregation and others of like interests, against the trustees and officers so elected by said majority of the congregation, to have the plaintiffs adjudged to be

the rightful and lawful congregation and entitled to the possession and control of said church property, and hold the same for the use and occupation of the plaintiffs and the exclusion of all others; and that the defendants be adjudged to have no right, title, or interest in said church property, nor right to manage or control the same or interfere therewith, and that they be perpetually enjoined from doing so.   Upon such facts the court concluded, in effect, that the defendants had violated and perverted the trust created and prescribed in said deed, and were not the owners or entitled to the use of the church property; that the plaintiffs were the lawful and rightful congregation, and entitled to the exclusive use, possession, and control of the property described in the deed, and the whole thereof; and that the plaintiffs were the rightful and lawful trustees and officers of said congregation.   Thereupon judgment was entered that the plaintiffs are the lawful and rightful congregation, and entitled to the exclusive use, possession, and control of all the property belonging thereto; that the defendants, and each of them, their associates, servants, and agents, etc., be perpetually enjoined from in any manner taking or retaining possession of, interfering with, assuming control of, or exercising any authority over, any property of said church, and from holding the keys of, or locking or unlocking, said church edifice, and that they deliver up said keys to the plaintiffs; that the plaintiff trustees are the lawful and rightful trustees, and the regular successors of the trustees named in said deed, and as such have the right to the exclusive possession, control, and custody of said church edifice and premises, and of all of the property of the congregation, to hold the same for the use of the plaintiffs.   From such judgment the defendants appeal.

*Pinney & Sanborn*, attorneys, and *J. M. Olin*, of counsel, for the appellants, contended, *inter alia*, that the judgment is erroneous because it includes valuable property not

covered by the action.   The trust embraced in the trust deed
is void under our statutes because it undertook to create a
perpetuity unauthorized by law, not being within two lives
in being at its execution.   Every conveyance of lands to
religious corporations creates a perpetuity, and necessarily
implies a trust although none be expressed.  *Gram v. Prus-
sia E. E. L. G. Society*, 36 N. Y. 161.   All uses and trusts
in real property are abolished except those saved by ch. 57,
R. S. 1849.   And the exception in favor of charitable cor-
porations in the statutes of 1878 does not apply to churches.
*Ruth v. Oberbrunner*, 40 Wis. 238; *De Wolf v. Lawson*, 61
id. 469; *Methodist Church v. Clark*, 37 Mich. 730, 739;
*Little v. Willford*, 31 Minn. 173.   By a voluntary incorpo-
ration under the statute, made by the unanimous vote of
the society, any pre-existing religious trust is made subject
to the statute, and beyond the control of anybody except a
majority of the legal members of the society.  *Robertson
v. Bullions*, 11 N. Y. 243; *Petty v. Tooker*, 21 id. 267; *Gram
v. Prussia E. E. L. G. Society*, 36 id. 161.   Unless there is a
very plain and palpable abuse of a religious trust a court of
equity will not interfere.  *Miller v. Gable*, 2 Denio, 492;
*Watkins v. Wilcox*, 66 N. Y. 654; *Burrel v. Associate R.
Church*, 44 Barb. 282; *Att'y Gen. ex rel. Abbot v. Dublin*,
38 N. H. 460; *Trustees v. St. Michael's E. Church*, 48 Pa.
St. 20; *Watson v. Jones*, 13 Wall. 679; *Happy v. Morton*,
33 Ill. 398.   The government of the Evangelical Lutheran
Church in the United States is, in its essential features,
congregational or independent.   Each congregation is com-
pletely self-governing in character, not subject to the con-
trol of any synod, and not required to be in connection
with any synod.   Buck's Theolog. Dict. Appendix V, 471;
12 Am. Law Reg. 331, 332; *Lawson v. Kolbenson*, 61 Ill.
421; *Ehrenfeldt's Appeal*, 101 Pa. St. 186; *Fernstler v. Sie-
bert*, 114 id. 200; *Heckman v. Mees*, 16 Ohio, 583; *Miller v.
Gable*, 2 Denio, 492; *Burrel v. Associate R. Church*, 44

Fadness and others vs. Braunborg and others.

Barb. 282; *Watkins v. Wilcox*, 66 N. Y. 654; *Bartholomew v. Lutheran Cong.* 35 Ohio St. 567; *Presbyterian Cong. v. Johnston*, 1 Watts & S. 9; *Trustees v. St. Michael's E. Church*, 48 Pa. St. 20; *Rector v. Shivers*, 16 N. J. Eq. 453; *McGinnis v. Watson*, 41 Pa. St. 9. It is the settled doctrine of the English courts that it is the duty of the court to inquire and decide for itself both as to the nature and power of church judicatories, and as to which of the contending parties adheres to the true standard of faith in the church organization. *Watson v. Jones*, 13 Wall. 679, 727; *Att'y Gen. v. Pearson*, 3 Meriv. 353; *Craigdallie v. Aikman*, 2 Bligh, 529; *Galbraith v. Smith*, 15 Sc. Sess. Cas. 1st Ser. 808. The following cases in this country also hold to the rule that the decisions of the synods are not binding upon the courts where property rights are involved, but only in cases of membership, church discipline, etc. *Smith v. Nelson*, 18 Vt. 566; *Watson v. Avery*, 2 Bush, 332; *State ex rel. Watson v. Farris*, 45 Mo. 183; *Watson v. Garvin*, 54 id. 354; *Landis v. Campbell*, 79 id. 433; *Hendrickson v. Decow*, 1 N. J. Eq. 578; *Livingston v. Rector*, 45 N. J. Law, 230; *Gartin v. Penick*, 5 Bush, 110; *Harmon v. Dreher*, 1 Speer's Eq. 90; *Shannon v. Frost*, 3 B. Mon. 253; *Stack v. O'Hara*, 4 Leg. Gaz. (Pa.), 2; *Gordon v. Williams*, 3 id. 113.

For the respondents there was a brief by *Ollis & Helms*, attorneys, and *I. C. Sloan*, of counsel, and the cause was argued orally by *I. C. Sloan* and *John Ollis*. They cited *Watson v. Jones*, 13 Wall. 679; *Petty v. Tooker*, 21 N. Y. 272; *Gable v. Miller*, 10 Paige, 644; *Miller v. Gable*, 2 Denio, 492; Angell & Ames on Corp. sec. 38; High on Injunctions, sec. 305; *Att'y Gen. v. Welsh*, 4 Hare, 572; *Hale v. Everett*, 53 N. H. 9; *Roshi's Appeal*, 69 Pa. St. 462; *Kniskern v. Lutheran Churches*, 1 Sandf. Ch. 439; *Winebrenner v. Colder*, 43 Pa. St. 244; *McBride v. Porter*, 17 Iowa, 203.

CASSODAY, J.   1. The first question with which we are naturally confronted is whether the trust imposed by the deed of May 20, 1852, was valid under the statutes. At the time that deed was made Liberty Prairie congregation or church society had not yet been incorporated. In fact, it was not incorporated until September 8, 1862. The deed of the land was to five trustees named, and their successors in office for ever, for the uses and purposes therein mentioned. The deed required such trustees to erect and build upon the land thereby conveyed " a house of worship for the use of the *members* of the Norwegian Evangelical Church of St. Paul's on Liberty Prairie, according to the rules of said church and according to the rules of said church which " might thereafter " be adopted from time to time by their authorized. synods or conferences; and in further trust and confidence that, as often as one or more of " such trustees should " die or cease to be a trustee according to the rules of said church, then and in such case " it was therein made the duty of the minister, preacher, elders, deacons, or other church officers " to call a meeting of the *voters* of said church, . . . *according to the statute in such case made and provided,* and the voters at the meeting so called " were therein required " to nominate or appoint one or more persons to fill " such vacancies. From the language quoted, it is manifest that the grantors in the deed contemplated that the church or society would soon be organized and incorporated under the statutes, and that trustees should from time to time be elected by the persons qualified by statute to vote for the same; otherwise the statutes would not have been thus expressly referred to therein. Under the repeated decisions of this court, we must hold that the *mere fact* that such church or religious society had not yet been incorporated at the time of the delivery of that deed in no way frustrated the trust thereby

created, if such trust was otherwise valid. *In re Taylor Orphan Asylum*, 36 Wis. 534; *Dodge v. Williams*, 46 Wis. 100–102; *Gould v. Taylor Orphan Asylum*, 46 Wis. 106; *Webster v. Morris*, 66 Wis. 397.

It is true that the statutes in force at the time the deed was executed had abolished all " uses and trusts," except as therein authorized and modified. Sec. 1, ch. 57, R. S. 1849; sec. 1, ch. 84, R. S. 1858; sec. 2071, R. S. 1878. The same chapter provided that " express trusts may be created for any or either of the following purposes: . . . (5) For the beneficial interest of *any person or persons*, when such trust is fully expressed and clearly defined upon the face of the instrument creating it, subject to the limitations as to time prescribed in this title." Sec. 11, ch. 57, R. S. 1849; sec. 2081, R. S. 1878. According to the same statutes, it was provided that the word " person " might extend and be applied to bodies politic and corporate as well as to individuals. Subd. 12, sec. 1, ch. 4, R. S. 1849; ch. 5, R. S. 1858; sec. 4971, R. S. 1878. But by the deed the trust here created was " for the use of the *members* " of the church. Such designation of the beneficiaries as a class was sufficiently definite and certain to answer the requirement of the statute quoted. *Webster v. Morris*, 66 Wis. 381; *Heermans v. Schmaltz*, 7 Fed. Rep. 566. Although the chapter on religious societies is not included in the same title as the chapter so abolishing other trusts, yet no one can reasonably claim that the latter chapter was ever intended to prohibit what was expressly authorized by the former. At the time of the making of the deed the statutes expressly authorized the trustees of such religious societies " to take charge of the estate and property belonging thereto, and to transact all affairs relative to the temporalities thereof," and to " take into their possession and custody all the temporalities of such church, congregation, or society, whether the same may have been given, granted, or devised, di-

rectly *or indirectly*, to such church, congregation, or society, *or to any other person or persons for their use."* Secs. 1, 6, ch. 47, R. S. 1849; secs. 1, 7, ch. 66, R. S. 1858. So the next section of the same chapter provided that "such trustees may also, in their corporate name, . . . recover and hold . . . all churches, buildings, burying-places, and all the estate and appurtenances belonging to such church, congregation, or society, in whatsoever manner the same may have been acquired, or in whose hands soever the same may be held, as fully and amply as if the right and title thereto had been originally vested in the said trustees." So another section of the same statute provided that "all lands, tenements, and hereditaments that have been *or may hereafter* be lawfully conveyed by devise, gift, grant, purchase, or otherwise, *to any persons as trustees, in trust for the use* of any religious society organized, *or which may hereafter be organized*, within this state, either for a meeting-house, burying-ground, or for the residence of a preacher, *shall descend*, with the improvements, in *perpetual succession to*, and shall be held by, such trustees, in trust for such society." Sec. 21, ch. 47, R. S. 1849; sec. 23, ch. 66, R. S. 1858; sec. 2000, R. S. 1878. Such trust thus authorized, and such descent of trust property in such perpetual succession, cannot be regarded as a suspension of "the absolute power of alienation for a longer period" than prescribed by the statute then in force. Secs. 14, 15, ch. 56, R. S. 1849; ch. 83, R. S. 1858; secs. 2038, 2039, R. S. 1878. This is so because, within the meaning of those sections, such trustees were "persons in being by whom an absolute fee in possession" could be conveyed through the agency of the circuit court, as prescribed in the statute then in force. Sec. 18, ch. 47, R. S. 1849; sec. 19, ch. 66, R. S. 1858. Now, the trustees of such religious societies may lease, mortgage, sell, and otherwise dispose of real estate in the manner provided by their by-laws. Sec. 1992, R. S. 1878.

It is true that such deed did not expressly authorize a disposition of the land conveyed, nor did it expressly restrict such alienation. Presumably, such conveyance was made with reference to such powers of the trustees and the courts over the property under the statutes. We must hold that the trust imposed by the deed was valid under the statutes then in force. It follows that that deed put the legal title to the land conveyed in the trustees named therein, and their successors, for the uses and purposes therein mentioned.

2. So there would seem to be no doubt that upon the incorporation of the society, September 8, 1862, the legal title to such church property became vested in the corporation under the statutes cited, and as amended by ch. 337, Laws of 1860, and ch. 103, 169, Laws of 1862; and hence such property thereby became subjected to the exclusive control and management of the trustees of said society legally elected under the statutes, and their successors in office, in trust however for such uses and purposes of said church or society. There is no claim that trustees were not regularly elected annually by the united society under the statutes from September 8, 1862, to and including the election of the defendants *Braunborg* and *Hendrickson*, March 4, 1885. There appears to have been no opposition to such election of these two trustees. It is claimed on the part of the plaintiffs, and the court has partially, in effect, found, that the defendants, having a majority of the trustees on their side, May 17, 1885, caused the said church edifice to be closed against the said Rev. Otteson, as pastor of said congregation, and that such exclusion, and the adoption of the articles of faith, February 26, 1883, and the withdrawal of the majority of said society from the synod, March 2, 1887, operated as a forfeiture of all right of the defendants to act as trustees or officers of said society; and that said majority thereby forfeited all right

and title to and use of all the property of the society. There is no pretense, however, that the large majority of the society represented by the defendants did not meet at the regular times and places appointed for the annual meeting of said society in March, 1886 and 1887, respectively, and elect trustees in place of those whose terms of office then expired. There is, moreover, no claim that any of the trustees thus regularly elected are among the plaintiffs named in this action. By reason of these things, it is, in effect, claimed that the minority who had adhered to said Rev. Otteson, and with him separated from such majority in the spring of 1885, at the time for holding the annual meeting of the society, March 3, 1886, rightfully assembled together and elected five trustees in place of those so elected by the majority, and that the five so elected by the minority, and their successors in office, are among the plaintiffs; and that at the time for holding the annual meeting of the society, March 2, 1887, such minority assembled and elected two trustees in place of two elected by them the year before.

3. The question therefore recurs whether, by reason of such supposed forfeiture, the plaintiffs,— trustees and officers thus elected by such minority,— in behalf of themselves and those acting with them, can, by this bill in equity, oust the defendants,— trustees and officers thus elected by such majority,— and install themselves in their places, as in effect adjudged by the trial court. As indicated, the deed contemplated the early incorporation of the society under the general statutes then in force, and entitled "Of Religious Societies," above cited. It was not so incorporated until September 8, 1862. Whatever doubt may have prevailed prior to the enactment of ch. 337, Laws of 1860, there can be no doubt since that the male persons of lawful age, *forming such society*, were the persons who "became incorporated," and thereby acquired the right to "possess,

have, hold, and enjoy all the rights, privileges, and franchises incident to such corporations." Id. sec. 1. The language therein prescribed for the certificate is: "We, . . . whose names are hereunto subscribed, have agreed, and by these presents do agree, to become incorporated into a religious society," etc. *Ibid.* Upon the recording of such certificate, the same chapter declared that "the *persons named therein* shall be deemed and regarded in law *as corporators, and they and their associates* are hereby declared to be *a body corporate and politic,* with perpetual succession, by the name and style designated in such certificate, and by such name and style shall be competent to contract and be contracted with, . . . to ·purchase, have, hold, and enjoy property, both real and personal, and to sell, dispose of, and convey the same." Id. sec. 4. Since that time the statutes have continued to recognize the male members of such society of lawful age as the body incorporated. Ch. 411, Laws of 1876; ch. 91, R. S. 1878. The statute also provides that such corporation "shall possess the powers and privileges granted" by the "General Provisions Relating to Corporations" (ch. 85, R. S.), "so far as the same are applicable or necessary to accomplish its purposes." Sec. 1991, R. S. By the very act of becoming incorporated, the several members of the society, and their then officiating minister, one and all, subjected themselves to the several provisions of the statutes applicable thereto, and thereafter became severally bound by such statutes and the subsequent amendments thereof. Such statutes fixed the qualifications of voters and the manner of electing trustees, or prescribed the method of fixing the same. Secs. 1–3, ch. 66, R. S. 1858; secs. 1990–1993, R. S. Such trustees are designated as officers in the statute, where it is said that they shall "hold *their offices* until others are chosen." Sec. 1993, R. S. So, as observed, the powers and authority of the trustees over the property and affairs

of the corporation are prescribed by statute. Manifestly, the relation of such trustees to the society is not that of private trustees to the *cestui-que-trusts*, but rather. that of managing officers of a corporation to the corporators thereof. Such religious corporation is in no sense an ecclesiastical corporation, although it may be connected with an ecclesiastical body. On the contrary, it is a civil corporation, governed by the statutes and such rules of the common law as may be applicable. Such being the relation of the trustees and corporators, the more precise question suggested is whether it was competent for a small minority of such corporators, having a real or supposed grievance, to separate themselves from the others, and go through the form of disfranchising all other corporators, and then elect trustees and officers in place of those who had been regularly elected by the majority under the statutes, and then oust such majority trustees of the powers and authority given them by statute, and install themselves in their places. In other words, Is it the province of a court of equity, in an action like this, to perpetually enjoin, and in effect oust, the regularly elected trustees and officers of such corporation from exercising the powers and authority given them by statute, and install in their places those who confessedly never were elected such trustees or officers in the manner or by the voters prescribed by or under the statute? In *Kniskern v. Lutheran Churches*, 1 Sandf. Ch. 439, 564, the learned assistant vice-chancellor, assuming that the relation between the trustees of such religious corporation and the corporators was similar to that of private trustees and their *cestui-que-trusts*, removed the defendant trustees elected by the majority from office, and declared such offices vacant, and *ordered the appointment* of new trustees, and decreed that the one plaintiff trustee was entitle to the possession and control of the church property. But that decision has since been repeatedly, in effect, overruled in the

same state, wherein the statutes were similar to ours. *Robertson v. Bullions*, 11 N. Y. 243, 271; *Petty v. Tooker*, 21 N. Y. 267, affirming *S. C.* 29 Barb. 256; *Gram v. Prussia E. E. L. G. Society*, 36 N. Y. 161; *North Baptist Church v. Parker*, 36 Barb. 171; *Burrel v. Associate Reformed Church*, 44 Barb. 282.

The views expressed above are fully supported by the reasoning of both opinions in *Robertson v. Bullions, supra.* It is there, among other things, in effect held that a religious corporation, under the statutes of that state, consisted of the members of the society who were themselves the corporators, and not merely of the trustees; that such trustees could not take a trust for the sole benefit of members of the church, as distinguished from other members of the congregation, nor for the benefit of any portion of the corporators to the exclusion of others, since no trust was authorized by the statute except for the use and benefit of the whole society; and that courts of equity, by virtue of their general jurisdiction over trusts, had no power to remove such trustees or officers who derive their offices directly from the statutes; nor had such courts power to prescribe qualifications for electors of such trustees, other than those prescribed by the statute. 11 N. Y. 265, 266, 271, 272. The other cases above cited from New York are of a similar import. From these authorities, and others to be cited, as well as reason, it follows, as a logical sequence, that before such corporators can recover the possession and control of church property *by virtue of being the rightful trustees* of such corporation, against those who have remained in continuous possession and control, claiming to be such rightful trustees, they must have been peaceably admitted to the offices of such trustees, or have established their title thereto by some direct proceeding or action brought for that purpose. *Ibid.; Lawson v. Kolbenson*, 61 Ill. 406; *Miller v. English*, 21 N. J. Law, 317; *People ex*

*rel. Stewart v. Young Men's F. M. T. A. B. Society*, 41 Mich. 67; *Trustees v. Bly*, 73 N. Y. 323. It is true that the chapter of our statutes expressly giving to the courts "supervisory power over corporations," and authority " to annul corporations," does not extend to " religious corporations." Sec. 3251, R. S. The remedy directly given by statute against persons who usurp, intrude into, or unlawfully hold or exercise, any public office, civil or military, or 'any franchise, within this state, or any office in a corporation created by the authority of this state, or when any such officer has done or suffered some act which operates as a forfeiture of his office, is by *quo warranto*. Sec. 3466, R. S. The trustees of such incorporation are obviously officers thereof, within the meaning of the statutes. We must hold that in so far as the judgment undertakes to oust the defendants of their offices, and install the plaintiffs or any of them in their places, or to restrain the defendants or any of them from exercising powers given to them as officers of the corporation by the statutes, the same is without authority of law, and hence cannot be sustained.

4. So, of course, we must hold that, in so far as the judgment assumes to cover the parsonage and other property not covered by the action nor involved in the issues, it is without authority. While these considerations necessarily work a reversal of the judgment, they do not dispose of the action.

5. It does not follow from anything thus far said in this opinion that the plaintiffs, as corporators, have no rights which the defendants are bound to respect. On the contrary, as already intimated, the rights of the several corporators are given by statute and hence are necessarily the same. We may, therefore, properly inquire whether there has been any such exclusion of the plaintiffs from the church edifice or the meetings of the society, or any such perversion of the use of that edifice, as to call for equitable

interference.   One branch of the argument is, in effect, that by the discipline and rules of the Norwegian Evangelical Lutheran Church the call of the minister is for life, and that such relation is indissoluble, except for false doctrine, immoral life, neglect of duty, or mutual consent; and hence that the vote of the majority of the corporators to discharge Rev. Otteson, March 4, 1885, and the exclusion of him from the church as pastor after May 17, 1885, was in effect the wrongful exclusion of all who adhered to him as such pastor, including the plaintiffs and the balance of the minority who acted with them.   Certainly the deed of trust makes no express reference to any such indissoluble relationship.   If it is to be inferred from the language therein employed, then it must be from the part declaring that the house of worship was to be " for the use of the members " of the church on Liberty Prairie, and "according to the rules of said church, and according to the rules of said church " which might thereafter "be adopted from time to time by their *authorized* synods or conferences."   We are referred to no rule of that church fixing such indissoluble relationship.   That church did not become a member of the synod until February, 1853.   The constitution of the synod at that time reserved " to every individual congregation  .  .  . the right to have its own laws for its home management," provided they did not conflict with the constitution and resolutions thereof.   The call of the church to the Rev. Otteson, September 15, 1858, expressly stipulated that either he or the church might at any time rescind such call upon giving one year's notice.   That was subsequently expunged by the wardens.   But nothing seems to have been agreed upon indicating that such call was for life, nor that such relationship was indissoluble.   But, however that may be, yet when Rev. Otteson and the society united in procuring the incorporation of the society under the statutes in 1862, their relationship thereby became fixed.   At that time the

trustees seem to have had the power to employ the min-
ister, but his salary or compensation was required to be
ascertained and fixed by a majority of the society entitled
to vote at the election of trustees.   Sec. 18, ch. 66, R. S.
1858.   This placed the matter of employing and discharg-
ing ministers substantially at the control of the majority of
the corporators, as the employment or continuance of a
minister would depend substantially on the amount of the
salary.   11 N. Y. 263, 264.   The late Revision seems to
have left the matter to be regulated by the corporators and
trustees, under the constitution and by-laws of the society.
Sec. 1994, R. S.

Such dismissal and employment of a minister is, more-
over, a matter of contract, and pertains to the temporalities
of the church, and does not necessarily operate as a change
of faith or doctrine.   We must hold that it was competent
for a majority of the voters in the society to discharge
Rev. Otteson and employ another minister in his place;
and that such mere discharge of the one, and the employ-
ment of the other, did not operate in law as a perversion of
the trust, nor as an exclusion of the plaintiffs or any mem-
ber of the society.   *Hardin v. Baptist Church,* 51 Mich.
137; *Ehrenfeldt's Appeal,* 101 Pa. St. 186; *Smith v. Nelson,*
18 Vt. 511; *Sale v. First Regular Baptist Church,* 62 Iowa,
26, 49 Am. Rep. 136; *Landis v. Campbell,* 79 Mo. 433, 49
Am. Rep. 239.

6. The question remains whether there has been any
such perversion of the trust by reason of a departure from
doctrine and faith and a withdrawal from the synod as
calls for equitable interference.   As indicated, the grant
was in trust " for the use of the members of the Norwegian
Evangelical Church of St. Paul's *on* Liberty Prairie, accord-
ing to the rules of *said church,* and according to the rules
of said church " which might thereafter " be adopted from
time to time by their *authorized* synods or conferences."

Manifestly this language did not contemplate that such use of the church should be strictly in accordance with fixed and unalterable rules.   On the contrary, it contemplated a living society, composed of thoughtful members who were not only to become incorporated under the statutes but capable of formulating such other rules for the church as might be adopted from time to time by their authorized synods or conferences.   The synod or conference to which the society subsequently attached itself had not then been established, and the language employed was evidently in contemplation of its subsequent establishment and action by virtue of authority thereafter to be given by such church or society.   The grant then is, in substance, for the use of the members of the church on Liberty Prairie, according to such rules as they had or might thereafter adopt for themselves, or authorize such synod or conference to adopt for them.   In other words, the deed, within certain limitations, contemplated a self-governing society and corporation.   As already observed, the constitution of the synod to which it became attached in 1853, reserved "to every individual congregation . . . the right to have its own laws for its home management," provided they did not conflict with the constitution and resolutions thereof.   This synod declared, in 1861, that "in regard to the internal arrangement and government of the individual congregations, the synod is only an advisory body.   No resolution by the synod in such matters can, therefore, have binding force on the individual congregation, unless it voluntarily accepts it; and if a congregation finds that it is in conflict with the Word of God, or that it is not beneficial to it under its peculiar circumstances, then it has the right *not* to follow the resolution."   In the articles of incorporation there is nothing indicating any particular faith, doctrine, or rule of action, unless it be the simple name of the " Norwegian Evangelical Lutheran Church of St. Paul's on Liberty

Prairie." This synod declared, in 1865, that "all were agreed that the synod ought not to have any kind of *legislative* authority, but that it should only be an *advisory body*. This authority to determine the ceremonies which, according to the old constitution, was placed in the hands of the synod, it had never made use of." The constitution of the synod adopted in 1876 declared that "the only source and rule of the faith and teaching of the synod is God's Holy Word, revealed in the canonical books of the Old and New Testaments. . . . The synod adopts as its confession of faith the symbolical books or confessional writings of the Norwegian Lutheran Church, for the reason that these writings give a pure and unadulterated exposition of the doctrine contained in the Word of God. These confessional writings are the following: The three ancient creeds, to wit, the Apostolic, the Nicene, and the Athanasian creed; the unadulterated Augsburg Confession; Luther's Smaller Catechism." This confessional is substantially the same as in the constitution of the synod in force in 1853. Such confession is therein declared to be unalterable. The congregations are therein *advised* to retain the Norwegian ritual of the year 1685, and the altar book of the year 1688. The constitution of 1876 provides for the admission of individual congregations into the synod by their adoption of the constitution of the synod, and submitting for its acceptance the constitution and by-laws of such congregation applying for such admission; and also their temporary suspension, and finally severance of connection, in case of persistent false doctrine or ungodly life. It is therein said that "the synod is composed of the congregations that have united by adopting this constitution." So it is declared therein that "doctrinal questions and matters of conscience cannot be decided by majorities of votes, but only by the Word of God and the symbolical books of our church. . . . If not otherwise provided in this consti-

tution, and if not otherwise determined in particular cases by the meeting concerned, all other matters are decided in the . . . meetings by a plurality of votes. . . . *In respect to the individual congregations the above-named meetings are merely advisory bodies.*" Thus it appears that the congregations are not created or established by the synod, but that the synod is really nothing more than a conference of pastors, teachers, and members of the church council, as representatives of the respective congregations, who meet periodically for mutual benefit, counsel and advice. Obviously, the synod was not a union of the several local congregations as one church, with one head and one government, but rather a confederation of local self-governing churches, acting, so far as the local organization was concerned, merely as an advisory body. Such being the relation between the church on Liberty Prairie and the synod, no good reason is perceived, on principle or authority, why the mere withdrawal of such local church from the synod, March 2, 1887, was in violation of any of the rules of such church, or any rules of the synod authorized by the church. *Miller v. Gable*, 2 Denio, 492; *Trustees v. St. Michael's Ev. Church*, 48 Pa. St. 20; *Lawson v. Kolbenson*, 61 Ill. 407; *Petty v. Tooker*, 21 N. Y. 267; *Smith v. Nelson*, 18 Vt. 511. We must hold, therefore, that there was no such violation by such mere withdrawal. Since the church on Liberty Prairie was not, at the time of the commencement of this action, a merely subordinate branch of a general church organization having a general supervision or ultimate power of control over it, there seems to be no necessity for considering the numerous cases of that class cited by counsel.

7. But while the church on Liberty Prairie must be regarded as a self-governing corporation, owing no obedience or obligation to any higher ecclesiastical authority, it does not necessarily follow that the trustees and officers of the corporation, even with the sanction of the majority of the

corporators, can lawfully devote the church edifice to any purpose they may see fit, regardless of the legal rights of other corporators.  ·Whether they can or not must depend upon the terms of the grant and the law applicable.  The constitution of the synod, containing substantially the articles of faith quoted above, was adopted by the church on Liberty Prairie as early as February, 1853.  The language of the deed induces us to infer that such local congregation, as a true Lutheran church, had previously adopted in substance the same articles of faith.  The grant was made, presumably, with reference to such articles of faith.  The statutes provide for "organizing a corporation in connection with a church of their own peculiar tenets to be associated therewith."  Sec. 1990, R. S.  The certificate may specify that the signers "have organized themselves into a religious society of the ——— church (sect, or denomination)," located at the place named.  Sec. 1991, R. S.  See, also, ch. 284, Laws of 1880.  Although the certificate of incorporation here simply gave the name of such church, yet we are constrained to hold that the use of the church edifice must be restricted to the purposes specified in the grant.

This brings us to the more delicate question, whether the adoption by the majority of the specific articles of faith, February 26, 1883, given in full above, was a perversion of such use.  The substance of the affirmative portions of these specific articles are to the effect that the election to eternal life or salvation is only efficacious through the faith and works of the recipient.  The expert testimony tends to prove, and it does prove, that such portions are educed from the catechism authorized by the synod for general use from Erick Pontoppidan, or "Truth Promoting Godliness," and are within the scope of the articles of faith contained in the constitution of the synod above quoted.  The negative portions of such specific articles of faith reject as false, when taught, certain doctrines in effect contrary to such

affirmative portions; and may indicate a spirit of intolerance towards those who seem to believe that such election is entirely independent of the volition of such recipient. We cannot say, however, from the testimony, that such negative portions of such specific articles are in conflict with the articles of faith contained in such constitutions. They may be inconsistent with certain portions of such articles of faith, but it is equally apparent that such portions are equally inconsistent with other portions of the same articles. It is not the province of courts of equity to determine mere questions of faith, doctrine, or schism, not necessarily involved in the enforcement of ascertained trusts. In fact, the doctrine here controverted seems to be too refined and subtle to be clearly comprehended even by learned theologians, much less by laymen. Courts deal with tangible rights, not with spiritual conceptions unless they are incidentally and necessarily involved in the determination of legal rights. Such trusts, when valid and so ascertained, must of course be enforced; but to call for equitable interference there must be such a real and substantial departure from the designated faith or doctrine as will be in contravention of such trust. *Miller v. Gable*, 2 Denio, 492; *Happy v. Morton*, 33 Ill. 398; *Lawson v. Kolbenson*, 61 Ill. 407; *Att'y Gen. ex rel. Abbot v. Dublin*, 38 N. H. 459; *Watson v. Jones*, 13 Wall. 723, 724; *Eggleston v. Doolittle*, 33 Conn. 396; *Keyser v. Stansifer*, 6 Ohio, 363. The specific articles here so adopted by the majority do not seem to constitute such radical departure as to be a diversion of the trust. Besides, the minority remained united with the majority under the ministration of the Rev. Otteson for more than two years after such adoption of such specific articles before their separation. Such acquiescence, of itself, is an additional reason why equity should not interfere, in the absence of such clearly established violation. *Hale v. Everett*, 53 N. H. 11; *Att'y Gen. ex rel. Abbot v. Dublin*, *supra*.

There is still another reason why this suit in equity should not be maintained for any such supposed departure from the faith or doctrine impliedly referred to in the deed, and that is the fact that ten days before the commencement of this action the said majority, represented by the defendants, unanimously adopted a constitution consisting, substantially, of the said articles of faith embodied in the constitutions of the synod, and containing a clause expressly repealing "all former precepts or regulations," by whatsoever name, that had previously been "adopted" by said corporation and which were in conflict with the same. This would seem to be sufficient to remove all objections on the part of the minority to a reunion of the whole society. Such a consummation would seem to be in harmony with the injunction of Paul, "to walk worthy of the calling wherewith ye are called, with all lowliness and meekness, with long-suffering, forbearing one another in love; giving diligence to keep the unity of the Spirit in the bond of peace." Eph. iv. 1–3.    It is to be hoped that such may be the result.

*By the Court.*— The judgment of the circuit court is reversed, and the cause is remanded with direction to dismiss the complaint.