Lamb *et al. v.* Cain *et al.*

No. 16,065.

LAMB ET AL. *v.* CAIN ET AL.

CHURCHES.—*Deed of Trust.—Propagation of Certain Doctrines.—Diversion of Trust.*—Where property has been dedicated by way of trust to support and propagate any definite doctrines or principles, and is being diverted from the use intended by the donor, by teaching a doctrine different from that contemplated at the time the donation was made, it is the duty of the court to make such orders in the premises as will secure a faithful execution of the trust confided. But, to induce a court of equity to interfere, the case must present a plain and palpable abuse of trust.

SAME.—*Ecclesiastical Decisions.—How Regarded by Civil Tribunals.*—Where a civil right depends upon some matter pertaining to ecclesiastical affairs, the civil tribunal tries the right and nothing more, taking the ecclesiastical decisions out of which the civil right arises as it finds them, and accepts such decisions as matter adjudicated by another legally constituted jurisdiction.

SAME.—*Manner of Determining Right of Property of Organization.—Amendment of Church Constitution.—Powers of General Conference.*—Property was deeded to persons named in the deed as trustees, and to their successors in office, in trust, for the Church of the United Brethren in Christ, to have and to hold "as long as said society may continue to use the meeting-house as a house of religious worship, for the use of the members of the society of such church in the United States according to the rules and discipline which from time to time may be agreed upon and adopted by the church at their general conference, and in further trust and confidence that they shall at all times forever thereafter permit such ministers and preachers belonging to such church as shall from time to time be duly authorized by the said general conference to preach and expound God's holy word therein."

*Held,* that, under the constitution of said church, the general conference has power to determine what is the constitution under which it acts, and to determine what is the confession of faith of the church which it represents.

*Held,* also, that the amended constitution, etc., of said church was properly adopted by its membership, two-thirds of the members voting on the question voting in favor thereof.

*Held,* also, that when the general conference resolved that a revised confession of faith and amended constitution had become the fundamental belief and organic law of said church (two-thirds of the members of the church voting, having voted in favor thereof), and that it would be in force after a certain date, the same was in force after that date.

*Held,* also, that those who adhered to the amended constitution and revised confession of faith constitute said church, while those who refuse to do so, must be regarded as seceders, the revised confession of faith not being unscriptural or antagonistic to the doctrines, etc., of the church which existed at the time of the execution of the deed to the land in controversy.

·SAME.—*Amendment of Constitution.*—*Proportion of Votes Necessary.*—Where a two-thirds vote was required to amend the constitution of said church, it is not necessary that two-thirds of the entire membership of the church should vote in favor of so amending, but simply that two-thirds of those actually voting, should vote in favor thereof.

From the Wayne Circuit Court.

*T. J. Study, W. Lawrence* and *G. R. Young,* for appellants.

*J. F. Kibbey,* —— *Gunckel* and —— *Rowe,* for appellees.

COFFEY, C. J.—This was an action by the appellees, in the Wayne Circuit Court, against the appellants, to recover the possession of the real estate described in the complaint, to quiet title thereto, and to enjoin the appellants from exercising any control over the meeting-house situated thereon. Upon issues formed, the cause was, by agreement, submitted to the court for trial, with a proper request for a special finding of the facts proven, with the court's conclusions of law thereon.

As the nature of the controversy between the parties fully appears by the special finding of the facts filed by the court, we need not refer to the pleadings in the cause. It appears from the special findings, among other things, that, at the time this action was brought, the Church of the United Brethren in Christ was an organized religious society in the United States, having official bodies for the government of the church, its members, congregations, and officers; each being clothed with certain powers, as follows:

*First.* The official board of each congregation, which meets monthly, and transacts the business of the congregations. It consists of the recognized preachers, exhorters, leaders, stewards, trustees, and Sunday-school superintend-

ents who reside within the bounds of the congregation, or hold membership therein.

*Second.* The quarterly conference, composed of the presiding elder of the district, and the preacher in charge, and recognized preachers, exhorters, class-leaders and stewards, trustees and Sunday-school superintendents who reside within the district, or hold membership therein. It meets quarterly, and, among other things, appoints trustees of the meeting-houses, who hold during the pleasure of the quarterly conference.

*Third.* The annual conference, which meets yearly, is composed of the elders and licentiate preachers who have been received by the annual conference in each district, and is presided over by a bishop of the church.

*Fourth.* The general conference, which meets every four years, composed of elders, elected by the church members in every conference district throughout the society.

The official board is subordinate to the quarterly conference, the quarterly conference to the annual conference, and the annual to the general conference, the last being the highest legislative and judicial body of the church.

Some time prior to the year 1800 the Church of the United Brethren in Christ was organized as a religious society. No general conference of the church was held until 1815, when, on the 6th day of June of that year, the first general conference was held at Mt. Pleasant, in Pennsylvania, in pursuance of a call, which had before that time been made. This conference formulated a discipline, which contained the rules and doctrine, or confession of faith, of the church. Some changes in the phraseology of the last clause of this confession of faith were made by the general conferences of the church of 1819, 1825, 1833, 1837, 1841 and 1857, and in 1885 the confession of faith was as follows:

" OLD CONFESSION OF FAITH.

" In the name of God, we declare and confess before all

men that we believe in the only true God, the Father, the Son, and the Holy Ghost ; that these three are one—the Father in the Son, the Son in the Father, and the Holy Ghost equal in essence or being with both ; that this triune God created the heavens and the earth, and all that in them is, visible as well as invisible, and, furthermore, sustains, governs, protects and supports the same.

" We believe in Jesus Christ ; that He is very God and man ; that He became incarnate by the power of the Holy Ghost in the Virgin Mary, and was born of her ; that He is the Savior and Mediator of the whole human race, if they with full faith in Him accept the grace proffered in Jesus ; that this Jesus suffered and died on the cross for us, was buried, arose again on the third day, ascended into heaven, and sitteth on the right hand of God, to intercede for us ; and that He shall come again at the last day to judge the quick and the dead.

" We believe in the Holy Ghost ;. that He is equal in being with the Father and Son, and that He comforts the faithful, and guides them into all truth.

" We believe in a Holy Christian Church, the communion of saints, the resurrection of the body, and life everlasting.

" We believe that the Holy Bible, Old and New Testaments, is the word of God ; that it contains the only true way to our salvation ; that every true Christian is bound to acknowledge and receive it with the influence of the Spirit of God, as the only rule and guide ; and that without faith in Jesus Christ, true repentance, forgiveness of sins, and following after Christ, no one can be a true Christian.

" We also believe that what is contained in the Holy Scriptures, to wit, the fall in Adam and redemption through Jesus Christ, shall be preached throughout the world.

" We believe that the ordinances, viz., baptism and the remembrance of the sufferings and death of our Lord Jesus Christ, are to be in use and practiced by all Christian societies ; and that it is incumbent on all the children of God

particularly to practice them, but the manner in which ought
always to be left to the judgment and understanding of every
individual. Also the example of washing feet is left to the
judgment of every one, to practice or not; but it is not be-
coming of any of our preachers or members to traduce any
of their brethren whose judgment and understanding in these
respects is different from their own, either in public or pri-
vate. Whosoever shall make himself guilty in this respect,
shall be considered a traducer of his brethren, and shall be
answerable for the same."

This confession of faith was never submitted for ratifi-
cation or adoption to a vote of the members of the church,
but became the confession of faith and doctrine of the
church by reason of its adoption by the delegates to this
general conference, and as such it remained until the meet-
ing of the general conference held in May, 1889.

A general conference met in Pickaway county, Ohio, on
the 10th day of May, 1841. This conference did not ratify
the constitution adopted by the preceding general conference,
but adopted another constitution. A motion was made in
the conference that a constitution for the better government
of the church be adopted. On the following day the motion
for a constitution was called up, a spirited discussion ensued,
the vote was taken, and carried in favor of a constitution—
yeas 15, nays 7. On motion, a committee of nine—one from
each conference district—was appointed to draft a constitu-
tion. This committee reported a constitution, which was
read twice, and laid upon the table until the following morn-
ing, when it was read a third time by sections, and adopted.
This constitution was as follows:

## " Constitution of 1841.

" We, the members of the Church of the United Breth-
ren in Christ, in the name of God, do, for the perfecting of
the saints, for the work of the ministry, for the edifying of
the body of Christ, as well as to produce and secure a uni-

form mode of action, in faith and practice, also to define the powers and the business of quarterly, annual, and general conferences, as recognized by this church, ordain the following articles of constitution :

## "Article I.

" Section 1. All ecclesiastical power herein granted, to make or repeal any rule of discipline, is vested in a general conference, which shall consist of elders, elected by the members in every conference district throughout the society ; provided, however, such elders shall have stood in that capacity three years, in the conference district to which they belong.

" Sec. 2. General conference is to be held every four years; the bishops to be considered members and presiding officers.

" Sec. 3. Each annual conference shall place before the society the names of all the elders eligible to membership in the general conference.

## "Article II.

" Section 1. The general conference shall define the boundaries of the annual conferences.

" Sec. 2. The general conference shall, at every session, elect bishops from among the elders throughout the church, who have stood six years in that capacity.

" Sec. 3. The business of each annual conference shall be done strictly according to discipline ; and any annual conference acting contrary thereunto, shall, by impeachment, be tried by the general conference.

" Sec. 4. No rule or ordinance shall at any time be passed to change or do away the confession of faith as it now stands, nor to destroy the itinerant plan.

" Sec. 5. There shall no rule be adopted that will infringe upon the rights of any as it relates to the mode of baptism, the sacrament of the Lord's supper, or the washing of feet.

" Sec. 6. There shall be no rule made that will deprive local preachers of their votes in the annual conferences to which they severally belong.

" Sec. 7. There shall be no connection with secret combinations, nor shall involuntary servitude be tolerated in any way.

" Sec. 8. The right of appeal shall be inviolate.

### "ARTICLE III.

" The right, title, interest, and claim of all property, whether consisting in lots of ground, meeting-houses, legacies, bequests, or donations of any kind, obtained by purchase or otherwise, by any person or persons, for the use, benefit, and behoof of the Church of the United Brethren in Christ, is hereby fully recognized and held to be the property of the church aforesaid.

### "ARTICLE IV.

" There shall be no alteration of the foregoing constitution, unless by request of two-thirds of the whole society."

This constitution, together with the confession of faith, which had before that time been adopted, was printed as the constitution and confession of faith of the church in the discipline of that year, and in each succeeding discipline every four years up to the year 1889. This constitution was never submitted to the members of the church for their approval or disapproval, but went into force immediately by virtue of its adoption by said general conference, and thus became the organic law of the church, and so remained until May 13th, 1889.

General conferences of the church were held every four years from 1841 up to, and including, the year 1889, when the last one prior to this suit was held.

On the 8th day of January, 1849, one John Brown was the owner in fee simple of the land in controversy in this suit, and on that day he executed a deed of conveyance for said real estate, donating, giving, and granting to Andrew

Nicholson, Elias Lamb, Nathan Wilson, and Jesse W. Brooks, trustees, and to their successors in office, in trust for the church of the United Brethren in Christ, to have and to hold, the west half of said real estate forever, without any exception whatever, and the east half thereof, " as long as said society, or the citizens of the neighborhood, may continue to use the meeting-house as a house of religious worship for the use of the members of the society of the United Brethren Church in the United States, according to the rules and discipline which from time to time may be agreed upon and adopted by the church at their general conferences in the United States, and in further trust and confidence that they should at all times, forever thereafter, permit such ministers and preachers belonging to the said church, as should from time to time be duly authorized by the said general conferences to preach and expound God's Holy Word therein. * * *"

At the date of this deed there was, and ever since has been, a meeting-house on said land, used for the purpose of religious worship by a congregation of members of the Church of the United Brethren in Christ. It is known as " Sugar Grove Church," and is under the jurisdiction and control of the General Conference of the Church of the United Brethren in Christ. The legal title to said real estate has been held and owned by the trustees mentioned in said deed, and their successors in office duly elected and appointed, from the date of said deed to the date of the bringing of this suit.

A regular general conference of the church was held at Fostoria, Ohio, in May, 1885, composed of delegates duly and regularly chosen under the rules and regulations of the church provided therefor. At this conference, on the second day, a committee on revision, consisting of thirteen members, known and designated as " Committee No. Six," was appointed, to whom were referred the confession of faith, constitution, and section 3 of Chapter X. of the discipline.

At a later day in the conference this committee made a report, in which it was resolved that a church commission, composed of twenty-seven persons, be authorized and established, consisting of the bishops of the church and ministers and laymen, appointed and elected by that general conference, an equal number from each bishop's district—except that the Pacific district should have two members besides its bishop; that the duties and powers of this commission should be to consider the present confession of faith and constitution of the church, and prepare such a form of belief, and such amended fundamental rules for the government of the church, as will, in their judgment, be best adapted to secure its growth and efficiency in the work of evangelizing the world : *Provided,* First. That the commission shall preserve unchanged in substance the present confession of faith so far as it is clear. Second. That it shall also retain the present itinerant plan. Third. That it shall keep sacred the general usages and distinctive principles of the church on all great moral reforms as sustained by the Word of God in so far as the province of their work may touch them. The report further provided that a majority vote of the commission should be necessary for the adoption of a confession of faith and constitution for submission to the members of the church ; that the commission should meet at such time and place as the board of bishops might appoint, and was expected to complete its work by January 1st, 1886 ; that the commission should adopt, and cause to be executed, a plan by which the proposed confession of faith and constitution might receive the largest possible attention, and expression of approval or disapproval by the people of the church, including all necessary regulations for taking, counting and reporting the vote ; and that, when the result of the vote of the church showed that two-thirds of all the votes cast had been given in approval of the proposed confession of faith and constitution, it should be the duty of the bishops to publish and proclaim said result through the official organs

of the church; whereupon the confession of faith and constitution, thus ratified and adopted, should become the fundamental belief and organic law of the church, and providing further that the adoption of the constitution aforesaid should in no way affect any legislation of that general conference for the coming quadrennium.

This report was signed by eleven of the thirteen members of the committee, and there was also a report signed by the same members of the committee recommending a law on the subject of secret combinations to take the place of section 3 of Chapter X. of the discipline on that subject. A minority of the committee, consisting of two members, joined in a minority report denying the authority of the general conference to alter or amend the constitution of the church without first securing the consent of the members of the church by a two-thirds vote. The majority report was adopted by the conference, and on a subsequent day of the conference the members of the church commission were chosen, as provided for in the report.

In pursuance of this action of the general conference, this church commission so chosen met in Dayton, Ohio, on the 17th day of November, 1885, and formulated a confession of faith and amended constitution, to be submitted to the members of the church for their approval or rejection, said revised confession of faith and amended constitution being as follows:

## "REVISED CONFESSION OF FAITH.

" In the name of God, we declare and confess before all men the following articles of our belief:

### "ARTICLE I.

#### "OF GOD AND THE HOLY TRINITY.

" We believe in the only true God, the Father, the Son, and the Holy Ghost; that these three are one—the Father in the Son, the Son in the Father, and the Holy Ghost equal in essence or being with the Father and the Son.

Lamb *et al. v.* Cain *et al.*

## "ARTICLE II.
### "OF CREATION AND PROVIDENCE.

" We believe this triune God created the heavens and the earth, and all that in them is, visible and invisible; that He sustains, protects and governs these with gracious regard for the welfare of man, to the glory of His name.

## "ARTICLE III.
### " OF JESUS CHRIST.

" We believe in Jesus Christ; that He is very God and man; that He became incarnate by the power of the Holy Ghost, and was born of the Virgin Mary; that He is the Savior and Mediator of the whole human race, if they with full faith accept the grace proffered in Jesus; that this Jesus suffered and died on the cross for us, was buried, rose again on the third day, ascended into heaven, and sitteth on the right hand of God, to intercede for us; and that He will come again at the last day to judge the living and the dead.

## "ARTICLE IV.
### " OF THE HOLY GHOST.

" We believe in the Holy Ghost; that He is equal in being with the Father and the Son; that He convinces the world of sin, of righteousness, and of judgment; that He comforts the faithful and guides them into all truth.

## "ARTICLE V.
### "OF THE HOLY SCRIPTURES.

" We believe that the Holy Bible, Old and New Testaments, is the word of God; that it reveals the only true way to our salvation; that every true Christian is bound to acknowledge and receive it by the help of the Spirit of God as the only rule and guide in faith and practice.

## "ARTICLE VI.
### " OF THE CHURCH.

" We believe in the Holy Christian Church composed of true believers, in which the word of God is preached by men

divinely called, and the ordinances are duly administered; that this divine institution is for the maintenance of worship, for the edification of believers, and the conversion of the world to Christ.

### "ARTICLE VII.

#### " OF THE SACRAMENTS.

" We believe that the sacraments, baptism and the Lord's Supper, are to be used in the church, and should be practiced by all Christians; but the mode of baptism and the manner of observing the Lord's Supper are always to be left to the judgment and understanding of each individual. Also, the baptism of children shall be left to the judgment of believing parents.

" The *example* of the washing of feet is to be left to the judgment of each one, to practice or not.

### "ARTICLE VIII.

#### " OF DEPRAVITY.

" We believe that man is fallen from original righteousness, and apart from the grace of our Lord Jesus Christ, is not only entirely destitute of holiness, but is inclined to evil, and only evil, and that continually; and that except a man be born again he can not see the kingdom of heaven.

### "ARTICLE IX.

#### " OF JUSTIFICATION.

"We believe that penitent sinners are justified before God only by faith in our Lord Jesus Christ, and not by works; yet that good works in Christ are acceptable to God, and spring out of a true and living faith.

### "ARTICLE X.

#### " OF REGENERATION AND ADOPTION.

" We believe that regeneration is the renewal of the heart of man after the image of God through the word, by the act of the Holy Ghost, by which the believer receives the spirit

of adoption, and is enabled to serve God with the will and the affections.

## "ARTICLE XI.

### " OF SANCTIFICATION.

" We believe that sanctification is the work of God's grace, through the Word and the Spirit, by which those who have been born again are separated in their acts, words and thoughts from sin, are enabled to live unto God, and to follow holiness, without which no man shall see the Lord.

## "ARTICLE XII.

### " OF THE CHRISTIAN SABBATH.

" We believe that the Christian Sabbath is divinely appointed; that it is commemorative of our Lord's resurrection from the grave, and is an emblem of our eternal rest; that it is essential to the welfare of the civil community, and to the permanence and growth of the Christian church, and that it should be reverently observed as a day of holy rest, and of social and public worship.

## " ARTICLE XIII.

### " OF THE FUTURE STATE. .

" We believe in the resurrection of the dead; the future general judgment; and an eternal state of rewards in which the righteous dwell in endless life, and the wicked in endless punishment."

## AMENDED CONSTITUTION.

"In the name of God, we, the members of the Church of the United Brethren in Christ, for the work of the ministry, for the edifying of the body of Christ, for the more speedy and effectual spread of the Gospel, and in order to produce and secure uniformity in faith and practice, to define the powers and business of the General Conference as recognized by this Church, and to preserve inviolate the popular will of the membership of the Church, do ordain this Constitution:

## " ARTICLE I.

" Section 1. All ecclesiastical power herein granted, to enact or repeal any rule or rules of discipline, is vested in a general conference, which shall consist of elders and laymen elected in each annual conference district throughout the Church. The number and ratio of elders and laymen, and the mode of their election, shall be determined by the General Conference.

" *Provided,* however, that such elders shall have stood as elders in the conferences which they are to represent for no less time than three years next preceding the meeting of the General Conference to which they are elected; and that such laymen shall be not less than twenty-five years of age, and shall have been members of the Church six years, and members in the conference districts which they are to represent at least three years next preceding the meeting of the General Conference to which they are elected.

" 2. The General Conference shall convene every four years, and a majority of the whole number of delegates elected shall constitute a quorum.

" Sec. 3. The ministerial and lay delegates shall deliberate and vote together as one body; but the General Conference shall have power to provide for a vote by separate orders whenever it deems it best to do so; and in such cases the concurrent vote of both orders shall be necessary to complete an action.

" Sec. 4. The General Conference shall, at each session, elect bishops from among the elders throughout the Church, who have stood six years in that capacity.

" Sec. 5. The bishops shall be members *ex officio* and presiding officers of the General Conference; but in case no bishop be present, the conference shall choose a president *pro tempore.*

" Sec. 6. The General Conference shall determine the number and boundaries of the annual conferences.

"Sec. 7.  The General Conference shall have power to review the records of the annual Conferences, and see that the business of each annual conference is done strictly in accordance with the Discipline, and approve or annul as the case may require.

" Sec. 8.  The General Conference shall have full control of the United Brethren Printing establishment, the Home, Frontier, and Foreign Missionary Society, the Church Erection Society, the General Sabbath School Board, the Board of Education, and Union Biblical Seminary.  It shall also have power to establish and manage any other organization or institution within the Church.

" Sec. 9.  The general conference shall have power to establish a court of appeals.

" Sec. 10.  The general conference may—two-thirds of the members elected thereto concurring—propose changes in, or additions to, the confession of faith :  *Provided,* That the concurrence of three-fourths of the annual conference shall be necessary to their final ratification.

"ARTICLE II.

" The general conference shall have power, as provided Article I., section 1, of this constitution, to make rules and regulations for the church ; nevertheless, it shall be subject to the following limitations and restrictions :

" Section 1.  The general conference shall enact no rule or ordinance which will change or destroy the confession of faith ; and shall establish no standard of doctrine contrary to the confession of faith.

" Sec. 2.  The general conference shall enact no rule which will destroy the itinerant plan.

" Sec. 3.  The general conference shall enact no rule which will deprive local preachers of their votes in the annual conferences to which they severally belong.

" Sec. 4.  The general conference shall enact no rule which will abolish the right of appeal.

"Article III.

" Section 1. We declare that all secret combinations which infringe upon the rights of those outside their organization, and whose principles and practices are injurious to the Christian character of their members, are contrary to the word of God, and that Christians ought to have no connection with them.

" The general conference shall have power to enact such rules of discipline with respect to such combinations as in its judgment it may deem proper.

" Sec. 2. We declare that human slavery is a violation of human rights, and contrary to the word of God. It shall, therefore, in nowise be tolerated among us.

"Article IV.

" The right, title, interest, and claim of all property, both real and personal, of whatever name or description, obtained by purchase or otherwise, by any person or persons, for the use, benefit, and behoof of the Church of the United Brethren in Christ, are hereby fully recognized and held to vest in the church aforesaid.

"Article V.

" Section 1. Amendments to this constitution may be proposed by any general conference—two-thirds of the members elected thereto concurring—which amendments shall be submitted to a vote of the membership throughout the Church, under regulations authorized by said conference.

" A majority of all the votes cast upon any submitted amendment shall be necessary to its final ratification.

" Sec. 2. The foregoing amended constitution shall be in force from and after the first Monday after the second Thursday of May, 1889, upon official proclamation thereof by the board of bishops : *Provided,* That the general conference elected for 1889 shall be the lawful legislative body under the amended constitution, with full power, until its

final adjournment, to enact such rules as this amended constitution authorizes."

The church commission established a plan of submission of the proposed revised confession and amended constitution to a vote of the members of the church, in which it was provided:

*First.* That the confession of faith as a whole should be submitted to a vote of the church, those favoring its adoption to have written or printed upon their ballots the words " Confession of Faith, Yes ; " those opposed to its adoption to have written or printed upon their ballots the words " Confession of Faith, No."

*Second.* That the amended constitution as a whole should be submitted to a vote of the church members, with the following exceptions : Article I., in so far as it related to lay delegation in the general conference, to be voted upon separately ; those favoring its adoption to have written or printed on their ballots the words " Lay Delegation, Yes ; " those opposed, the words " Lay Delegation, No ; " also, section 1, of article III., to be submitted separately, those favoring its adoption to have written or printed upon their ballots the words " Section on Secret Combinations, Yes ; " those opposed, the words " Section on Secret Combinations, No ; " those favoring the adoption of the remainder of the constitution to have written or printed on their ballots the words "Amended Constitution, Yes ; " those opposed, the words "Amended Constitution, No." It was further provided that the vote should be taken during the month of November, 1888, and that the publishing agent at Dayton, Ohio, should furnish each presiding elder, three months before the time of voting, the necessary number of tickets and return blanks ; the presiding elder to distribute them to the pastors in his district, and the pastors to distribute them in proper quantities to their several societies at least ten days before the time of voting. The pastor, leaders, and stewards of each society were constituted a local board of tel-

Lamb *et al. v.* Cain *et al.*

lers, and it was made their duty on the day of voting to enroll the names of all who voted, and to receive no votes except those presented in person by the members on the day fixed for voting by the local board of tellers, except that where a member was incapacitated by age or sickness to attend, or a minister be absent on his charge, such persons were permitted to send their ballots with their names signed on the back thereof. The list of voters was required to be preserved for one year, and it was made the duty of each local board of tellers immediately to make a full report of the vote taken, on a blank provided for this purpose, to its annual conference board of tellers, who were to be elected by each annual conference at the session next preceding the time of voting; and these annual conference boards of tellers were required to receive the returns from the local boards of tellers in the bounds of the conference, and to count and transmit a full and accurate report of the same, on blanks provided, to the general board of tellers, on or before January 1st, 1889. Provision was also made in cases where the presiding elders or annual conferences neglected or refused to comply with instructions. A general board of tellers, consisting of seven persons, was constituted at Dayton, Ohio, whose duty it was to receive the reports from the annual conference boards of tellers, and to count and make a full and accurate report of the same to the board of bishops not later than the 15th day of January, 1889. The board of bishops were directed to prepare a letter addressed to the church on the work of the commission, to be published through the *Religious Telescope*—the official organ of the church—and otherwise, which was done in January, 1886, and the bishop's address, accompanied by the commission act, plan of submission, and proposed confession and constitution, were distributed generally throughout the church immediately thereafter.

During the month of November, 1888, the vote was taken in all respects as provided for in said plan of submission,

and the votes were counted and canvassed by the several boards of tellers, as therein provided, and the result of the vote was declared by the general board of tellers on the 15th day of January, 1889, and said result was published in the *Religious Telescope* on the 23d day of January, 1889; said result being declared to be as follows:

For the confession of faith . . . . . . . . 51,070
Against the confession of faith . . . . . 3,310

For the amended constitution . . . . . . 50,685
Against the amended constitution . . . . 3,659

For lay delegation . . . . . . . . . . . 48,825
Against lay delegation . . . . . . . . . 5,634

For section on secret combinations . . . . 46,994
Against section on secret combinations . . 7,298

That the total number of votes cast for
and against the several propositions was . . 54,369

The enrolled membership of the church in 1888 was 204,517, said enrollment being made by the preachers of the church under a disciplinary law, and that at the election, held in November, 1888, throughout the church for delegates to the general conference of 1889, at which election all the members of the church, without regard to age or sex, were entitled to vote, the total number of votes cast was 58,839.

The proclamation of the vote as above stated was agreed upon and signed at Chambersburg, Pennsylvania, May 6th, 1889, by all the bishops of the church except one, who was present but declined to sign; and the same was published in the official organs of the church, as required in the plan of submission adopted by the general conference.

A general conference of the church, composed of delegates duly and regularly elected under the laws, rules and regulations of the church, met at the York Opera House, in

York, Pennsylvania, on Thursday, May 9th, 1889. On the second day of the conference the church commission, which had been established by the general conference of 1885, as above stated, submitted to the conference· a report of the work done by it in connection with the amended constitution and revised confession of faith, embodying in said report the said constitution and confession of faith, the plan of submission, and the action and vote of the members of the church upon the several propositions submitted as stated above. This report was referred to a special committee of seven, with instructions to report to the conference whether the commission had acted in compliance with the instructions of the general conference, and whether the vote had been orderly and regular ; and also to recommend to the conference such action as might be deemed proper to be taken in the premises. Five members of this committee, on Saturday, May 11th, 1889, submitted to the conference a report commending and approving the work of the commission, and recommending the adoption of the following resolutions :

" *Resolved,* By the general conference of the church of the United Brethren in Christ, in quadrennial session assembled in the city of York, Pennsylvania, May 9th, 1889, that the recorded proceedings of the commission, including the revised confession of faith and amended constitution, as formulated and submitted to the vote of the church, together with the methods of submission and all other acts by which the will of the church was ascertained thereon, are hereby approved and confirmed.

" 2. That because of the truth that the revised confession of faith and amended constitution as a whole, and all the separate propositions thereof, submitted to the membership of our church, have been adopted by more than the required two-thirds of all the votes cast thereon, as required by the general conference of 1885, it is hereby declared and published by this conference, and for itself, that the said revised confession of faith and amended constitution, as framed

and submitted by the lawfully constituted commission of the church, are become the fundamental belief and organic law of the church of the United Brethren in Christ, and will be in full force and effect on and after the 13th day of May, A. D. 1888, upon the proclamation of the bishops as provided and ordered in said amended constitution."

A minority report, signed by two members of the committee, was also submitted to the conference, reciting that the course of the church commission had been irregular in certain particulars therein specified, and suggesting that the general conference submit such amendments of the constitution to the vote of the people as it might deem wise and prudent, which should be regarded as a petition for such proposed changes. The report of the majority of the committee was adopted upon a roll call by a vote of 110 for to 20 against it.

On the 13th day of May, 1889, there was published in the *Religious Telescope* the proclamation of the board of bishops, signed by J. Weaver, J. Dickson, N. Castle, E. B. Kephart and D. K. Flickinger, duly qualified and acting bishops of the church, publishing and proclaiming the result of the vote of the church, in accord with the provisions of the general conference of 1885, said result being as above set forth ; and announcing further that the result of said vote being the required two-thirds, they did thereby publish and proclaim the document thus voted to be the confession of faith and constitution of the church of tne United Brethren in Christ.

. On Monday, May 13th, 1889, after the proclamation of the board of bishops had been read to the general conference, fifteen of the twenty members who had voted against the adoption of the report of the committee as above stated, and who had, up to this time, been participating in the deliberations of the body, withdrew from the York Opera House, where the general conference was then being held, and met in a body at the Park Opera House in said city of York, and,

after organizing, adopted a paper, which stated, in substance, that, inasmuch as one hundred and·ten of the delegates and members of the general conference did, on May 11th, 1889, vote to adopt a new constitution and confession of faith, and did, on the 13th day of May, 1889, through the presiding bishop declare the same in force, thereby forming a new church, therefore they were declared to have thereby vacated their seats as members of the general conference of the church of the United Brethren in Christ. Daily sessions of this body were held until the following Saturday, when it adjourned *sine die.* It transacted business pertaining to the affairs of the church, claimed to be the true general conference of the church, and declared its adherence to the old constitution and confession of faith. The persons composing it, and those acting with them, have since been known and designated as " Radicals."

After the withdrawal of these members, the conference which had been in session at the York Opera House, continued its sessions each day until Tuesday, May 21st, when it adjourned *sine die.* It adopted a resolution reciting that, whereas, certain delegates—naming them—had actively participated in the proceedings of that body from its organization to the close of its third day's session, and had then vacated their seats and joined in the formation of another church organization, outside and separate and apart from the place properly and officially occupied by the lawfully elected general conference of the church, therefore resolved, that the aforesaid persons were declared as having irregularly withdrawn from that body and the church, and were, in view of these facts, no longer ministers or members of the Church of the United Brethren in Christ. It also adopted certain rules concerning insubordination of members of the church, and transacted other business pertaining to the church. This body, and those acting with it, have since been known and designated as " Liberals."

Those designated as " Radicals " have, since the general

conference of 1889, adhered to the old constitution and confession of faith, and rejected the amended constitution and revised confession of faith ; those known and designated as "Liberals" accept the revised confession of faith and amended constitution, and have been, since that time, acting thereunder and in conformity therewith.

The court further found that since the general conference of 1889, the doctrines and beliefs of the church, preached from the pulpits and taught in the Sunday schools of the church by both " Liberals" and " Radicals," have not been different in any respect from the doctrine preached or taught before said conference was held, and that the new, or revised, confession of faith is not unscriptural or antagonistic to the doctrines, creed, faith or belief of the church which existed at the time of the execution of the deed to the land in controversy.

The plaintiffs in this case have been duly elected trustees of said Sugar Grove Church, in all respects as required by the rules and regulations of the church, and were such when this suit was brought, and they and each of them accept the amended constitution and revised confession of faith, and claim to be acting thereunder and in harmony therewith.

The defendants have been duly elected trustees of said church, in all respects in conformity to the rules and usages of the church, but they adhere to the old constitution and confession of faith, and reject the amended constitution and revised confession of faith ; and that when this suit was brought, they were in possession of the property in controversy, and were denying the plaintiffs' right to the possession thereof or the use of the same, and were excluding the plaintiffs from the possession and use thereof.

It appears by this statement of the facts in the case that there are two church organizations, each claiming to be the church known as the United Brethren in Christ.

The central question in the case is this : Which of these organizations is the church ?

A proper solution of this question depends upon the correct decision of numerous other legal questions which cluster around it, and upon which its solution depends.

In order to understand these questions, and to properly decide them in the order in which they are presented, it is necessary to state some of the general principles of law applicable to this class of cases, and by which they are governed.

The questions which have come before the civil courts concerning the rights to property held by ecclesiastical bodies have been divided into three classes, namely : *First.* Cases where the property which is the subject of controversy has been by deed, or will, of the donor, or other instrument by which the property is held, by the express terms of the instrument, devoted to the teaching, support, or spread of some specific form of religious doctrine or belief.

*Second.* To property held by a religious congregation which, by the nature of its organization, is strictly independent of other ecclesiastical associations, and, so far as church government is concerned, owes no fealty or obligation to any higher authority.

*Third.* To cases of property held by a religious congregation, or ecclesiastical body, which is a subordinate member of some general church organization in which there are superior ecclesiastical tribunals with general ultimate powers of control more or less complete, in some supreme judicatory over the whole membership of that general organization. *Watson* v. *Jones,* 13 Wallace, 679.

As to the first class, it may be said, there is no doubt that a person owning property in his own right may dedicate such property, by way of trust, to support and propagate any definite doctrines or principles, provided it does not violate any law of morality, and sufficiently expresses in the instrument by which the dedication is made the object of the trust. In such cases it is the duty of the courts, in a case properly made, to see that the property so dedi-

cated is not diverted from the trust attaching to it, and so long as there are persons in interest, standing in such a relation to the property as that they have a right to direct its control, they may prevent the diversion of the property to any use different from that intended by the donor. If such trust is confided to a religious denomination or congregation it is not in the power of a majority of that denomination or congregation, however large the majority may be, by reason of a change of religious views, to carry the property thus dedicated to the support of a new and different doctrine.

Where it is alleged, in a cause properly pending, that property thus dedicated is being diverted from the use intended by the donor, by teaching a doctrine different from that contemplated at the time the donation was made, however delicate and difficult it may be, it is the duty of the court to inquire whether the party accused of violating the trust is teaching a doctrine so far at variance with that intended as to defeat the objects of the trust, and if the charge is found true, to make such orders in the premises as will secure a faithful execution of the trust confided. *Watson* v. *Jones, supra; Miller* v. *Gable,* 2 Denio, 492; *Attorney General, ex rel.,* v. *Pearson,* 3 Mer. 353 ; *Watkins* v. *Wilcox,* 66 N. Y. 654 ; *Attorney General, ex rel.,* v. *Town of Dublin,* 38 N. H. 459 ; *Happy* v. *Morton,* 33 Ill. 398 ; *Fadness* v. *Braunborg,* 73 Wis. 257.

But, to induce a court of equity to interfere, the case must present a plain and palpable abuse of trust.

In the case of *Fadness* v. *Braunborg, supra,* it was said by the court: "It is not the province of the courts of equity to determine mere questions of faith, doctrine, or schism not necessarily involved in the enforcement of ascertained trusts. * * * Courts deal with tangible rights, not with spiritual conceptions unless they are incidentally and necessarily involved in the determination of legal rights. Such trust, when valid and so ascertained, must of course be enforced ; but to call for equitable interference there must

be such a real and substantial departure from the designated faith or doctrine as will be in contravention of such trust." So, in *Happy* v. *Morton, supra,* it was said : " There must be a *real* and *substantial* departure from the purposes of the trust, such an one as amounts to a perversion of it, to authorize the exercise of equitable jurisdiction in granting relief." This language was quoted with approval in the case of *Lawson* v.*Kolbenson,* 61 Ill. 405.

In the case at bar the land was conveyed to the persons named in the deed as trustees, and to their successors in office, in trust for the church of the United Brethren in Christ, to have and to hold, the west half forever, without any exception, and the east half thereof " as long as said society, or the citizens of the neighborhood, may continue to use the meeting-house as a house of religious worship for the use of the members of the society of the United Brethren Church in the United States, *according to the rules and discipline* which from time to time may be agreed upon and adopted by the church *at their general conferences in the United States,* and in further trust and confidence that they shall at all times forever thereafter permit such ministers and preachers belonging to such church as shall from time to time *be duly authorized by the said general conference* to preach and expound God's holy word therein."

It is quite obvious from the language used in this deed that it was the intention of the donor to place the property, in a measure, under the control of the general conference, and that the house thereon used for public worship should be used by such minister or preachers as were authorized by such conference to preach. It is but reasonable also to presume that he did not intend that a doctrine antagonistic to that held by the United Brethren in Christ at the time of the donation should be preached in the house of worship situated upon the land.

In this case, however, there is an express finding of the circuit court that heard the evidence in the cause, to the effect

" that since the general conference of 1889 the doctrines and beliefs of the church, preached from the pulpits and taught in the Sunday schools of the church, by both ' Liberals' and ' Radicals,' have not been different in any respect from the doctrines preached or taught before that conference was held."

It is further expressly found by the circuit court " that the new or revised confession of faith is not unscriptural or antagonistic to the doctrines, creed, faith or belief of the church which existed at the time of the execution of the deed to the land in controversy."

Assuming, without now deciding, that what is termed in these proceedings the new or revised confession of faith, has been legally adopted, and is now the confession of faith of the church, we are unable to discover such an antagonism between it and the old confession of faith, as does, in our opinion, amount to a perversion of the trust. It can not be said that there is a *real, substantial* departure from the purposes of the trust, such as would authorize the exercise of the equitable jurisdiction of the courts to grant relief, or that there is a plain and palpable abuse of the trust which calls for the interference of the courts.

There is no claim by either of the parties that this case falls within the rules governing the second class above named, and for that reason such rules need not be examined here.

And this brings us to an examination of the rules of law governing the third class to which, it is conceded by all the parties to this controversy, the case now under consideration belongs.

It may be remarked, at the outset, that the civil courts in this country have no ecclesiastical jurisdiction. There is a complete separation of church and state. Every one has the legal right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality or property, and which does not infringe the personal rights of oth-

ers, which may seem to him right and proper, without any interference from the courts. The law here knows no heresy, and is committed to the support of no dogma. It recognizes the right of the people to organize voluntary religious associations, to assist in the dissemination of any and all religious doctrines, with the exceptions above named, and to create tribunals for the decision of controverted questions of faith, and for ecclesiastical government of all the individual members, congregations, and officers within the general association.

All who unite with such associations, when so organized, impliedly consent to submit to such government. From these considerations the rule in this country has become elementary that, when a civil right depends upon some matter pertaining to ecclesiastical affairs, the civil tribunal tries the right, and nothing more, taking the ecclesiastical decisions out of which the civil right has arisen as it finds them, and accepts such decisions as matters adjudicated by another legally constituted jurisdiction. *White Lick, etc.,* v. *White Lick, etc.,* 89 Ind. 136; *Watson* v. *Jones, supra; Dwenger* v. *Geary,* 113 Ind. 106; *Connitt* v. *Reformed, etc., Church,* 54 N. Y. 551; *Gaff* v. *Greer,* 88 Ind. 122; *Harrison* v. *Hoyle,* 24 Ohio St. 254.

In the case of *White Lick, etc.,* v. *White Lick, etc., supra,* this court said : " The civil courts act upon the theory that the ecclesiastical courts are the best judges of merely ecclesiastical questions, and of all matters which concern the doctrines and discipline of the respective religious denominations to which they belong. When a person becomes a member of a church he becomes so upon the condition of submission to its ecclesiastical jurisdiction, and however much he may be dissatisfied with the exercise of that jurisdiction, he has no right to invoke the supervisory power of a civil court so long as none of his civil rights are invaded."

In the case of *German Reform Church* v. *Seibert, ex rel.,* 3

Bar. 291, it was said by the court: " The decisions of ecclesiastical courts, like every other judicial tribunal, are final ; as they are the best judges of what constitutes an offence against the word of God and the discipline of the church. Any other than those courts must be incompetent judges of matters of faith, discipline and doctrine ; and civil courts, if they should be so unwise as to attempt to supervise their judgments on matters which come within their jurisdiction, would only involve themselves in a sea of uncertainty and doubt, which would do anything but improve either religion or good morals."

In this case it is contended by the appellants that the new constitution and the revised confession of faith were never legally adopted, and that those acting under such constitution and confession of faith have created a new organization, which is not the church of United Brethren in Christ, while they, adhering to the old constitution and the old confession of faith, which are still in force and unchanged, constitute the church, and that they are for that reason entitled to hold and control the property in controversy.

We think it must be true that if the old constitution and the old confession of faith have never been legally changed, and are still in force, those adhering thereto constitute the church ; while, on the other hand, if they have been legally changed and the new constitution and new confession are now the confession of faith and constitution of the church of the United Brethren in Christ, those who refuse to accept and act under them are to be regarded as seceders, and no longer members of that church, and have no right to control its property.

In this connection it is contended by the appellants that the constitution could not be changed or amended without a previous request of two-thirds of the entire membership of the church, and that a vote of less than two-thirds of the entire membership was not sufficient to authorize such amendment.

Lamb *et al. v.* Cain *et al.*

While Article IV. of the constitution of 1841 prohibits the general conference from making any alteration in that instrument unless by request of two-thirds of the whole society, it is to be observed that it is silent as to the time at which such request shall be made, as well as the manner of making it.

It can not be successfully maintained that the general conference of 1885, or the commission provided by its action, made any change in the constitution or in the confession of faith. The most that can be said of the action of that conference is that it adopted a plan by which the sense of the society might be taken upon the propriety of making certain amendments to the constitution and of revising the confession of faith.

When those proposed changes were submitted to a vote of the members of the society, it is said that less than two-thirds voted thereon, and that even if the vote could be treated as a request for such changes, it did not amount to a request of two-thirds of the whole society, as provided in the constitution itself.

It is undoubtedly true that organic law can not be changed in any other manner than that provided by the instrument itself, where it provides for an amendment or change, so the question is fairly presented as to whether the vote in favor of the amended constitution is to be regarded as a compliance with the constitutional requirements relating to amendments. And this involves, to some extent, the legal mode of ascertaining the number of legal voters at a given election. Upon this subject Mr. McCrary, in his work on Elections, says: " Where a statute requires a question to be decided, or an officer to be chosen, by the votes of ' a majority of the voters of a county,' this does not require that a majority of all persons in the county entitled to vote shall actually vote affirmatively, but only that the result shall be decided by the majority of the votes cast, provided always that there is a fair election and an equal opportunity for all to participate.

In such a case the only proper test of the number of persons entitled to vote is the result of the election as determined by the ballot-box, and the courts will not go outside of that to inquire whether there were other persons entitled to vote who did not do so.    The ' voters of the county, referred to by all such statutes, are necessarily the voters who vote at the election, since the result in each case must be determined by a count of the ballots cast, and not by an inquiry as to the number not cast.' " McCrary Elec. (3d ed.), section 173.    In support of the text are cited *People, ex rel.,* v. *Warfield,* 20 Ill. 160 ; *People, ex rel.,* v. *Garner,* 47 Ill. 246 ; *People, ex rel.,* v. *Wiant,* 48 Ill. 263 ; *Louisville, etc., R. R. Co.* v. *County Court of Davidson,* 1 Sneed, 636 ; Angell & Ames Corp. (9th ed.), sections 499–500 ; *City of Bridgeport* v. *Housatonuc R. R. Co.,* 15 Conn. 475 ; *Talbott* v. *Dent,* 9 B. Mon. 526 ; *State* v. *Mayor, etc.,* 37 Mo. 270 ; *St. Joseph Tp.* v. *Rogers,* 16 Wall. 644 ; *Cass County* v. *Johnson,* 5 Otto, 369, which fully support it.    It is said in some of these authorities that all who absent themselves from the election are presumed to assent to the will of the majority of those voting.    Those who refrain from voting must be presumed to know the law, and that they will be counted as assenting to the will of those who cast the required number of votes.

If we are to take the number of votes cast for and against the amended constitution and revised confession of faith as constituting the whole number of legal voters belonging to the society at the time of the election there were much more than two-thirds of the society expressing themselves in favor of the change, but if we assume, as contended by the appellants, that we are to go beyond the vote cast and inquire into the actual number of voters attached to the church, we have more than two-thirds of the vote cast favoring the amended, and a still larger number acquiescing therein.    But we are of the opinion that the number of votes cast at the election is to be considered, for the purposes of this ᴄase, as constituting the number of legal voters be-

longing to the church.    Any other rule would be impracticable, and would lead to endless confusion and contention.

As we have already said, the conference of 1885 did not amend the constitution or revise the confession of faith of the church, but formulated a plan looking to that end.

When the conference of 1889 met at York, Pennsylvania, the commission on revision reported to it the formulated amended constitution and revised confession of faith, together with the result of the vote thereon.    That body after a consideration of the whole matter resolved that the revised confession of faith and amended constitution, as framed and submitted by the lawfully constituted commission of the church, had become the fundamental belief and organic law of the Church of the United Brethren in Christ, and that it would be in full force and effect from and after the 13th day of May, A. D. 1889, upon, the proclamation of the bishops as provided and ordered in the amended constitution.

It is not denied that either the conference of 1885 or 1889 was, in fact, the conference of the United Brethren Church, legally elected and organized, but it is asserted that it had no jurisdiction to change the constitution or revise the confession of faith.

As bearing upon this question it must not be forgotten that the constitution of 1841 was framed and adopted by a general conference, and went into force without submission to a vote of the members of the church.    It remained the organic law of the society from that date until 1889, a period of more than forty years, and so far as we are able to ascertain from the record before us, the power of the conference to make and adopt such an instrument was not questioned.

In the case of *Chase* v. *Cheney*, 10 Am. Law Reg. (N. S.) 295, it was decided that the decision of an ecclesiastical court upon an ecclesiastical matter, as to its own jurisdiction, was conclusive upon the civil courts.

It has been held in this State by repeated decisions, that

where a court of limited jurisdiction has jurisdiction to proceed, and does proceed, the same presumptions prevail in favor of its action, and in favor of the verity of its record, as if its powers were general, and that where such a tribunal is required to ascertain and decide upon facts essential to its jurisdiction, its judgment thereon can not be attacked collaterally. *Stout* v. *Woods*, 79 Ind. 108 ; *State* v. *Wenzel*, 77 Ind. 428 ; *Featherston* v. *Small*, 77 Ind. 143 ; *Stoddard* v. *Johnson*, 75 Ind. 20 ; *Ricketts* v. *Spraker*, 77 Ind. 371.

It will scarcely be denied that the general conference, which is the highest legislative and judicial body in the church, has power to determine what is the constitution under which it acts, and to determine what is the confession of faith of the church which it represents.

The question as to whether the old confession of faith and the old constitution had been superseded by the new was a question that squarely confronted the conference of 1889.

Assuming that the action of commission on revision, coupled with the action of the conference of 1885, and vote upon the subject of revision and amendment, gave it jurisdiction in the premises, the general conference of 1889 adjudged and declared that what appears in the record before us as the revised confession of faith and amended constitution, was in fact the fundamental belief and constitution of the church of the United Brethren in Christ in the United States.

Who shall question the correctness of its decision or revise it ?   The civil courts ?   To do so would be to assume ecclesiastical jurisdiction, a jurisdiction they do not possess. It was clearly an ecclesiastical matter, pertaining to the government of the church, and the church, through its legally constituted tribunal, having adjudicated the matter, we think the civil courts are bound by such adjudication.

It follows that what appears in the record before us as the amended constitution and revised confession of faith are the constitution and confession of faith of the church known as

the United Brethren in Christ, and that those who adhere to them constitute the church, while those who refuse to do so must be regarded as seceders.

But it is urged that the confession of faith was never legally changed, because the constitution of 1841 forbade any change therein.

It is not denied that such confession of faith could be made after a change in the constitution. We know of no reason why the question of revision of confession of faith might not be submitted with a proposition to amend the constitution. The question of construing the constitution of 1841 was purely for the church anthorities. They determined that both questions could be submitted together, and the conference of 1889 have adjudged that this was legally done. This being a purely ecclesiastical matter, we have no power to review their decision. It is binding upon us as well as the members of the church, and so we must hold that the confession of faith was legally revised.

It follows from what we have said that the circuit court did not err in its conclusions of law upon the facts as stated in this record.

Judgment affirmed.

McBRIDE, J., took no part in the decision of this cause.

Filed Nov. 6, 1891.